## George Isaacs v. The State.

### *No. 1380. Decided December 9th, 1896.*

36   505
38   378

#### 1. Murder—Indictment—Counts—General Verdict.

Where an indictment for murder contained three courts, one charging defendant as principal, one charging him as an accomplice to one H., and the third charging him as an accomplice to some person to the grand jurors unknown. Held: That a general verdict of guilty, without stating the count upon which it was based, is sufficient, and will be applied to either one of the counts which was sustained by the proof.

#### 2. Accomplice to Murder—Conspiracy to Commit Robbery—Responsibility of a Conspirator For Acts of Others.

Under an indictment charging defendant as an accomplice to a murder, the proof must show that some person, with whom he had conspired, committed the murder. If those, with whom he had conspired, employed others to commit the crime which resulted in the murder, he is responsible to the same extent as if he had made the agreement with them himself. Having set in motion that which resulted in the death of deceased, he is an accomplice to any person, whether instigated by himself directly, or instigated by those with whom he had conspired.

#### 3. Same—Positive Proof—Circumstantial Evidence—Charge.

On a trial for murder, where the evidence showed a conspiracy to rob an express car on a railroad, the confession of one of the parties employed to commit the robbery, to the effect, that he was present when deceased was killed by the parties attempting the robbery, if true, is positive proof that deceased was killed by one of the conspirators to the robbery. And where the proof showed that four men were engaged in the attempted robbery, and defendant, as a witness, states positively that one S., with whom he had conspired, was present when deceased was shot. Held: The case is not one of circumstantial evidence, and the court was not required to charge the law of circumstantial testimony.

#### 4. Bill of Exceptions—Opinion Evidence as to Handwriting.

A bill of exceptions to the admission of the opinion of a witness, as to the handwriting of defendant, in a certain letter, to be sufficient, should show that no evidence was adduced either of the witness' competency as an expert, or that he was familiar with defendant's handwriting, or had ever seen him write, and should moreover show that the contents of said letter went, in evidence, to the jury.

#### 5. Murder in the Attempt at the Perpetration of Robbery—Evidence Sufficient.

See, opinion for facts stated, which are Held: Sufficient to establish, that, the murder was committed in the attempt at the perpetration of robbery.

Appeal from the District Court of Hardeman. Tried below before Hon. J. M. Standlee, Special Judge.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

Appellant was indicted in Hemphill County, for the murder of Tom T. McGee, on the 23d of November, 1894. The venue was changed to the County of Hardeman.

The testimony is substantially as follows: G. W. Fishburn testified, "That on the 22nd day of November, 1894, he was cashier of the First National Bank of Kansas City, and on that day the defendant presented a check to the said bank for payment, amounting to $683.60, payable to himself, and that witness required an identification of the appellant, and the check, being drawn by Drum-Flato Company, witness sent the

defendant to their office at the stock yards, after which the appellant returned, with the check endorsed by J. W. Flato, 'O. K.' whereupon the witness paid the same, first handing out ten and twenty-dollar bills, but the appellant said he was a trader with the Indians, and he wanted smaller money; witness then paid him $500 of said check in one and two-dollar bills; the witness recognized the defendant as being the man to whom he paid said money."

A. A. Rinehart testified that he was the agent of the Wells-Fargo Express Company at Kansas City, at its Union depot office, and that the defendant came to said office, and inquired of the witness the rate of express on money from Kansas City to Canadian, on the 21st day of November, 1894; that witness informed him it was $1.50 per $1000; that appellant said he wanted to send some money to Canadian the next day; that appellant returned the next day and obtained five or six express envelopes, and went away, and returned the same day, and delivered to said agent five packages of money, sealed up and directed to himself, at Canadian, Texas, and marked $5000 in each package, and stated to the witness that the packages contained $5000 each, and paid express on that amount, and obtained receipts therefor; that someone was with defendant when he came in the last time, but witness had not seen him since; that the witness did not count the money, because it was contrary to the rules of the express company to do so; that the defendant was a stranger to him, but that he recognized him as being the man.

J. F. Keneoster testified that he was an express messenger of the said express company on the date of the shipment of said money, and that he received the same from the agent, Rinehart, of the State line office, and carried the case to Woodward, Indian Territory, and there delivered the packages in good condition to the express messenger running between Woodward and Panhandle, Texas, via Canadian; that Jim Stockton, guard of the express company, got on the car with him at Winfield Junction, Kansas, and came through with him; that the money was placed in a through special safe.

Burl Weishart testified that he was the express messenger for said express company, running between Woodward, Oklahoma, and Denton, Texas; and that on the 23rd day of November, 1894, he received the five packages of money at Woodward, Indian Territory, from J. F. Keneoster, and brought the same through to Canadian, Texas, arriving at Canadian about 7:30 p. m., at which place he delivered the said packages to the agent of the express company, A. B. Harding.

J. W. Conatser testified that on the 23rd day of November, 1894, about twenty miles down the Canadian river, and east from the town of Canadian, he met four men riding in the direction of Canadian about 9 or 10 o'clock in the morning; that he spoke to them, but they did not speak, but some of them nodded their heads; that three of them were dark complexioned men, having no beard except a mustache, and one of them was tall and light complected, with small burnsides and sandy

mustache; that their horses were two bays, one sorrel and one dark-brown or black; that each one had a Winchester and a mural on the horn of their saddles partly filled, and some of them had overshoes; that they were then about three miles east of the Oklahoma and Texas line; that he afterwards saw one of these horses in the possession of Captain Arrington, a few days after Tom McGee was killed; that Tom McGee was shot that night; that Hemphill County had only about twenty voters; that it was unusual to see that number of men armed riding good horses in that part of the country; that they did not try to avoid him.

J. N. Webb testified that on the 23rd day of November, 1894, between 12 and 1 o'clock, at a point about nine miles down the Canadian river from the town of Canadian, he met four men, all armed with Winchesters, having overcoats and overshoes, and riding a sorrel horse, one black horse and two bay horses; that they had murals made of oat sacks on their saddles, partly filled; that these men were going in the direction of Canadian; that the black horse turned his hind feet out as he walked, making the track of the shoe appear broader; that he afterwards saw two of these horses, one a sorrel and one a bay; that the bay horse was ridden to his place by G. W. Kopp; that he saw the other one in Dick Bustle's stable at Canadian.

Doc Walton testified that on the 23rd day of November, 1894, he was at Canadian, and left shortly after noon to go home, and met four men about five or six miles east from the town of Canadian, going in the direction of Canadian, at about 3 o'clock in the afternoon; that two of them were riding bay horses, one a sorrel with a white face, and one a black horse; that one of them was a light complexioned man with small burnsides and mustache, tolerably tall, and would weigh 175 or 180 pounds; that the others were smaller men, dark complexioned, with mustache and no beard; two of them were riding forty or fifty yards ahead of the other two; that they had murals on their saddles, seeming to be made of oat sacks, with feed therein; that each one had a Winchester on his saddle; some of them had overshoes; that witness took one of them to be Will Black; that witness saw Jim Harbolt at jail in Canadian, where he was taken to see if he could identify said Black, but did not know Black, and while witness was at the jail Jim Harbolt got up and said, "May be I am 'Tulsey Jack';" he didn't know him, but was satisfied that he was one of the four men he saw on that day he went out there from Canadian; witness stated that he identified Jim Harbolt as one of the men he saw in the bunch of four.

Mrs. John Miller testified that she saw four men near Canadian, on the evening of the 23rd of November, 1894, about four o'clock, horseback, five or six hundred yards from the stock pens at Canadian; that she saw three horses; there were two bay horses and one dark brown or black in the outfit; she didn't see the fourth horse, but she could see the body of the man riding him, the horse being hidden over a little rise.

A. B. Harding testified that he was the agent of the express com-

pany at Canadian, Texas, in November, 1894, and that on the evening of the 23rd, about eight o'clock, the passenger train came in from Kansas City, and that he received from the express car, from the through safe therein, five packages of money, being the same as identified by the other witnesses. The witness identified the express envelopes, which were introduced in evidence, and stated that they were in good condition when received. That he delivered the express packages to the defendant on the 23rd day of November, 1894, in the forenoon; that defendant's brother, Sam Isaacs, who lives at Canadian, came to the depot and identified the defendant. The defendant wanted the witness to retain the money in the depot until Monday, stating that he wanted to ship some of it back, which the witness refused to do. Appellant told the witness that he had shipped the money there to pay for cattle, and that he would bring back some of it next day (Sunday), but witness told him he would not receive it next day, whereupon defendant and his brother went away with the packages; that as soon as witness discovered that this large sum of money was in the express car he sent Vas Stickley for the sheriff, Tom T. McGee. That McGee came down about the time the train pulled out, and that witness explained to him why he had sent for him. That McGee stepped out of the waiting-room door at the northeast corner of the depot, to see if there were any suspicious characters around, and as soon as he stepped out the shooting began, just outside of that door; that witness saw the flash of a pistol through a window in the direction where McGee was; that after the shooting was over McGee came into the depot and said he was shot, and he was then taken into the freight room and laid on a cot; that when witness got out of the express car to tell Vas Stickley to go for the sheriff, he met a stranger standing out from the express car, whom he subsequently identified as Jim Harbolt; that witness saw these packages of money opened on the 25th day of November, 1894, in the presence of defendant, at Sam Isaacs' room in the town of Canadian, and the money taken out and counted; that the packages were in good condition when opened, the same as when he received them and delivered them to the defendant; that each contained one hundred dollars, in one and two dollar bills; that the defendant raised no objection to the count, and made no claim that the packages were not exactly in the same condition as when he delivered them to the express company at Kansas City.

Dan McKenzie testified, that he had resided for three years in D. County, Oklahoma, about eighty-five miles down the Canadian river from Canadian, Texas; that he had been in jail on the charge of conspiracy to rob the express company, jointly indicted with the defendant on that charge; that his house consisted of two rooms, built with picket timbers, and that it was about twenty-five miles from Taloga, Oklahoma, and about forty miles south of Woodward, being east of Canadian and on the south side of Canadian river; that he knew Bill Doolan since 1892, in Texas and Oklahoma, and that he had seen Bill Doolan and

Tulsey Jack together on different occasions, and Tulsey Jack also in company with Bill Doolan and Bitter Creek; that he saw Tulsey Jack a few days before Tom McGee was killed, about ten miles from witness' house; that he knew Joe Blake and Sam Blake, and that Tulsey Jack was their brother, and that his real name was Will Blake; that these three were at witness' house some time in September, 1894, and said they wanted to get a claim on vacant land; that they had six or eight saddle horses; was all the stock they had; that they made arrangement for Joe Blake to board with witness, and keep his horse at witness' house; that Joe Blake boarded there from October up until the time he was arrested, and that Sam Blake and Tulsey Jack went off down toward Taloga; that they located a claim on Gyp creek, about ten or twelve miles from witness' house; that witness had been up to Woodward a week or ten days before Tom McGee was killed, and saw Tulsey Jack, Joe Blake and Sam Blake, and took dinner with them at their camp, which consisted of a tent; on Sunday evening, shortly before sundown, on the 25th of November, 1894, Joe Blake, Bitter Creek, Tulsey Jack, Jim Harbolt and Jim Stanley came to witness' house, from the direction of Canadian, on the road which Captain Arrington took when he left witness' house, after arresting Joe Blake on the following morning; that all the horses which these parties were riding had been ridden hard; except that of Bitter Creek; that they were all armed with Winchesters, two of them had pistols that witness knew of; that the horses they were riding were three bays, one black and a sorrel; that the horse Bitter Creek rode was a bay, and had not been ridden hard; that Bitter Creek was suffering from a wound in the thigh and was able to ride but little, and that these parties spoke of Bitter Creek having joined them five or six miles from witness' house; that they all had murals on their saddles, made of tow sacks, and all had overshoes. About 10 o'clock at night Sam Blake knocked at the door, and Tulsey Jack and Stanley pulled their pistols and asked who was there, and when Sam Blake spoke they put up their pistols. He came in and brought with him three overcoats and three pairs of gloves, which were distributed between Tulsey Jack, Bitter Creek and Stanley. Sam Blake asked if they had heard the news, and the reply was, "What news?" He then stated that the sheriff of Canadian had been killed. That they all looked at each other, got up and saddled their horses and left, except Joe Blake; but before they went away Tulsey Jack and Bitter Creek stated to witness that if he told the officers about them being there, they would shoot him down like a wolf, and that witness did not tell it until after Tulsey Jack had been killed; that shortly after New Year's witness saw Tulsey Jack at Taloga, and he asked witness what he had heard about McGee being killed. Witness told him he had heard it two or three different ways; that Tulsey Jack told him that they claimed there were seven or eight of them there, but there was only four; that three were at the depot, and Joe Blake held the horses; that he showed witness a letter purporting to be written by George Isaacs, stating that he had gotten out of

Canadian jail, but hadn't given anything away. Tulsey Jack accused witness of giving them away, and offered him three hundred dollars to go to Canadian and swear Joe Blake out of jail; that witness and his wife started home from Taloga, but were followed by Bitter Creek and Tulsey Jack, who drew their Winchesters on witness and threatened to kill him; that witness had denied to Captain Arrington that these parties were at his house, because he was afraid he would be killed; that he had at one time testified that Joe Blake was not at his house, and that that was the reason he so testified; that Sam Blake was a small, dark complexioned man, with black mustache, and would weigh about 150 pounds; that Tulsey Jack was also a small man, would weigh about 145 pounds, slight Roman nose, cheek bones a little prominent, dark complexion, stubbed, dark mustache; that Jim Stanley was a man six feet tall, small burnsides, light complexion, light blue eyes and sandy mustache. Witness admitted that he had testified to a lie in regard to Joe Blake, but that it was because of fear that if he testified to the truth these parties would kill him. Witness said the signature to the letter shown him he thought was similar to that on the express packages shown to witness. In detailing the conversation between witness and Tulsey Jack at Taloga, shortly after New Year's, he said Tulsey Jack told him that they went to Canadian to get the money shipped there by George Isaacs, but Isaacs had tried to swindle them and the express company, too.

Dr. J. M. Newman testified that he was a physician, and attended on McGee after his wounds at Canadian; that McGee was sheriff of Hemphill County; he was dead;. died on the 24th day of November, 1894, in Hemphill County, Texas, from the effect of a gunshot wound entering just above the right hip bone, and ranging upward and towards the right, and lodging near the navel in front. Witness identified the plat of the depot at Canadian, which appears in the statement of facts. Testified to the distances shown on the plat, giving the location of the different points around the depot, and the manner in which the town was laid out; that he was sent for shortly after the shooting, on the night of the 23rd of November, 1894, and found deceased lying on a cot in the depot; that deceased stated in the presence of witness that he (deceased) had come down to the depot at the request of Mr. Harding, agent at the depot, for the purpose of assisting to guard the depot, and that a short time after he arrived there he went out of the depot office, through the waiting-room and stepped outside, at the door which leads into the waiting-room at the east end, and that just as he stepped outside a man came walking from the west end of the platform, which is on the north side of the depot, and that he met him at the door which goes into the waiting-room and said to the man, "Hello! where did you come from?" to which the man replied, "From that light back there," pointing back in the direction toward the west end of the platform, on the north side of the depot; that McGee said to the man, "Where are you going?" and he pointed across to another light, which witness understood to be the light

at Paul Hoeffle's saloon. The man didn't stop, but kind of walked around, and McGee said to him, "Hold on; I want to see you," or "I want to speak to you;" that the man immediately whirled, jerked out his pistol and began shooting at McGee. McGee tried to get out his pistol, but it hung, and perhaps snapped; that the man who was shooting at him, after firing one or two shots, jumped off the platform to the north and next to the house track, and continued firing, McGee shooting at him. McGee said that when he pulled out his pistol, shooting at the man who was shooting at him, he threw his right side towards the man who was doing the shooting. This platform, where McGee said the man jumped off, was about two and one-half feet high. This all happened in Hemphill County, Texas. There were two bullet holes through McGee's clothes, besides the one which entered his body; that is, there had been two holes shot through his clothes which did not touch him. Judging from the wound, the party who fired the shot must have been to the right of McGee, and lower than he was. If the shooting occurred where he said it did, a person at the nigger woman's house could not have seen the shooting. McGee made a number of statements to different persons at his house, after he was carried up there, some before and some after he was informed that he could not recover. Witness was with him all night. Witness heard McGee make the statement, after he was shot, that he had seen the man who shot him that day in town, and took him to be a photographer, and approached him for an occupation tax, but discovered his mistake; that he was a small man, dark complexion, dark mustache; otherwise had no beard.

Vas Stickley testified that he had known the deceased for a number of years, and that he had died from a gunshot or pistolshot wound received on the 23rd of November, 1894, in Hemphill County, Texas; that he died on the 24th; that witness was with deceased within ten minutes after he was shot, at the depot in Canadian; that witness went to the depot when the train came in, and that Mr. Harding, the agent, sent witness after McGee; that he went to McGee's house, four or five hundred yards away, and informed him that he was wanted at the depot; that witness and deceased walked out together, and went toward the depot, and that witness went by his own place and got a pistol, and by a store and got some cartridges, and arrived at the depot a short time after the shooting; found deceased on a cot in the depot, and asked him about the shooting. Witness testified to substantially the same statements made by McGee, as were testified to by Dr. Newman, the last witness above named. He said the man who jumped off the platform near the northeast corner of the depot, was the man who shot him. Deceased was asked if Isham Anderson shot him, and he said he didn't. Deceased knew Isham Anderson. That witness was with deceased at Canadian, two or three week before the killing, and pointed out Isham Anderson to deceased, who said he knew him. Isham Anderson had no beard, except a mustache, at that time. Witness testified that he did not tell anybody about going to McGee's house for him to come to the

depot.    People were kept from going on the north side of the depot, where the deceased said the person who shot him had jumped off, so as to keep from putting out or disturbing the tracks that might be around there.    Next morning witness looked for tracks at the point where Mc-Gee said the man jumped off the platform, and found tracks of a sharp-heeled boot.    Other parties followed the trail.    Witness lived in Canadian, but never had seen the defendant there previous to the 24th of November; that defendant lived in the Indian Territory, about Chickasha; that his brothers, Sam and Bill, resided at Canadian; that previous to the shooting, before the train pulled out from the depot, witness saw a man standing at the west side of the bay window, next to the wall, having on an overcoat, with collar turned up.    Witness' attention was attracted to the man because he was standing there when witness went into the back room, and when witness came out.    He was a dark complexioned man, with dark mustache; a stranger to witness.    That man was not Isham Anderson.    He turned around in such a way as not to give the witness a fair look at him.    Witness said that it would require about five minutes, walking at an ordinary gait, to go from Mc-Gee's house to the depot.    There was an express car standing on the north side of the platform of the depot, and a little east of it.    Witness had thought, when he went to the depot, there was a light shining on the elevated part of the platform, west of the depot, but he could not see the lamp; a light in that direction somewhere.

R. M. McKay testified that he resided at Canadian for a number of years, and was there on November 23rd, 1894, and that his saloon was about 200 yards from the depot; that on the evening of November 23rd, 1894, some time after the train had come in, and after it had left, he was standing at his front door, and heard the shooting which resulted in the death of McGee, down at the depot; that he secured his pistol and ran down there, and arrived in a minute and a-half after the shooting; that there was an engine standing on the house track, fifty or sixty feet east of the depot, and that the headlight shone out in the direction of the north platform; there was no other light, except a platform lamp, sitting on the north side of the depot, about six feet from the wall of the depot, to the north, and eight to ten feet east of the corner of the depot; that witness walked around the depot, after he got there, and saw this lantern, and that there was no lantern on the south side, or in the direction of the privy.    'Witness found McGee in the freight room of the depot, half sitting on a cot, and helped him to lie down; asked him where he was shot, and deceased showed him.    Witness then asked him who did it, and he said he didn't know the man; that he was a small man with black mustache, without any beard, whom deceased had seen in town that afternoon.    Witness then testified substantially to the same statements of deceased, as testified to by witnesses, Newman and Stickley, as having been made to him on his arrival at the depot.    Witness stated that he was the first man to the depot after the shooting.    Saw nobody around at all.    That the depot was shut up, and witness rattled

at the door of the freight room, and the agent let him in. Witness went to the place where McGee said the man jumped off the platform who·shot him, the next morning, and saw the tracks of a man there, which looked like he had jumped off the platform, and kind of whirled after he had jumped; that witness followed these tracks around over to a point north of the depot a short distance, where the track was joined by that of another man, which latter had on overshoes, and which last track came from the west end of the depot, where a man had jumped off of the platform, as shown by the track, and ran pretty much in the same direction as the first mentioned party. Witness also took up the track of a man who had on overshoes, which led out from about the center of the platform which extends east from the depot. This last named track went between the Fay Hotel and the Chinaman's, and was that of a person wearing overshoes, who was running, judging from the way the dirt and sand were thrown out. This track the witness followed over north to a point seventy-five or one hundred yards away, to where all three tracks came together, which three tracks he followed down to the stock yards, some two or three hundred yards east of the depot, on the north side of the railroad, where four horses had been hitched, or held, and there found the tracks of a man, who had been staying with the horses, who also had on overshoes; that witness, Captain Arrington, and others, took the trail of these horses from the said stock pens down the Canadian River, and found where they had gotten down off their horses, some two or three miles from Canadian, stamped and stood around, showing the same identity of tracks as those above mentioned. This trail, the witness stated, that he and the other parties took and followed down to Dan McKenzie's, in Oklahoma Territory, east of Canadian. One of these horses was shod behind, and the track looked wide behind.

J. A. Chambers testified that he was acquainted with the defendant and his brothers, Sam and Bill, that witness was a merchant in Canadian, Texas, in November, 1894, well acquainted in that locality; never had seen the defendant there until about the 24th day of November, 1894, and that he had never been there before that witness knew of; that the defendant's brother, Sam Isaacs, introduced witness to defendant on the morning after Tom McGee was shot, when they were coming from the depot, and told witness that he wanted to put a little money in witness' safe to which the witness assented, and in a few minutes Sam Isaacs, defendant's brother, returned with a bundle tied up·with a string, and witness opened the door of the safe, and threw the package in. Sam Isaacs said he might want it the next evening, which was Sunday. The packages remained there in the safe until the afternoon of Sunday, when parties came to witness and asked him to stay out of the way, as they desired to examine the packages. On Sunday afternoon, witness turned the packages over to Sam Isaacs in the presence of the defendant, in Sam Isaacs' room; that they were in the same condition as when Sam Isaacs put them in the safe. The packages were there opened and the money counted in the

presence of defendant.   There was one hundred dollars in each package, in one and two dollar bills.   The defendant sat on the bed and tore little bits of paper, and looked to be nervous.   Defendant had not been arrested when the money was counted, but was arrested immediately afterwards.

D. J. Young testified, that he resided in Canadian at the time of the above occurrences, and was a banker; that he was present and counted the money when the express packages were opened, in Sam Isaacs' room, in the presence of the defendant.   Witness delivered the packages into court on the trial, and identified them as being the same ones, and as being in the same condition as when they were opened; that they were in apparently good condition when opened, and that the defendant was asked, before they were opened, if they were in the same condition that they were in when he got them from the depot, and he said they were; that when witness opened these packages, he announced that each one was $4900 short.   The defendant was present, and made no objection or complaint in regard to the counting, or the amount in each package.

Fred Horsbrugh testified that he was at the town of Canadian on the night that Tom McGee was killed; that at the time of the shooting he was sitting in the office of the Southerland hotel, at the south end of the business part of town, four or five hundred yards south of the depot; that defendant came to the hotel from the depot after Willie Southerland had brought up the wagon which hauled the passengers to their meals, from the depot.   He inquired of the Southerland boy if his brother, Sam, was there, and was told that he boarded there, but did not room there.   Defendant registered, and shortly afterwards went out with Southerland, upstairs to his room.   Witness was not able to state what time it was, but thought that the train had not gone out, and was between 8 and 9 o'clock; probably about half past eight.

Captain G. W. Arrington, sheriff of Hemphill County, testified, that he had held such office since December, 1894; that he knew the defendant for about ten years, and that he lived in Canadian, near Chickasha. Witness had never seen him at Canadian until the night Tom McGee was killed; that witness went off on the train that night to Panhandle City, and as he was going down Main street to the train, after it came in, and when he got near the depot, he met the defendant walking in the opposite direction, quite fast, and the defendant stopped and asked him where he could find a hotel.   Witness pointed across the railroad, in the opposite direction to that which the defendant was going, to the Fay hotel, but defendant did not turn around, but walked on in the direction he had been going, toward the Southerland hotel.   Witness arrived at Panhandle and received a telegram that McGee was killed, and returned to Canadian on a stock train, arriving there about 2 o'clock in the morning; that he staid at the depot until morning, and kept people away from the north side, and from making any tracks or disturbing those that had been made in that direction, and as soon as it was daylight, took the trail of some tracks near the waiting-room door on the north

side of the depot, that had been made by a person jumping off the platform; that it appeared that the party had whirled after jumping off; this was a small track, No. five or six boot, sharp heel. Witness followed this track to where it came in conjunction with another trail made by a person wearing overshoes, who had jumped off the west end of the platform of the depot, and at a point north of Fay's hotel. These two tracks and a third track, of a person wearing overshoes, came together, and all three led down to the stockyards, where there was the track of a fourth man, wearing overshoes, and the tracks of four horses. Witness and other parties took the trail of these four horses through the sand, down the Canadian river, and trailed the same to Dan McKenzie's house in D County, Oklahoma; that all the horses were barefoot except one, and the manner in which the tracks of the hind feet were made, looked like as though he was a pacing horse—the dirt was kind of thrown out each way; that in following this trail, some of the way, the parties were walking and leading their horses, and traveling in the night time, as the witness judged, because they had stepped in holes and places where persons would not have stepped if they could see. When the parties trailing these men arrived within five miles of Dan McKenzie's, dark overtook them. Being Sunday night, they sent some of the party to get information down the river, as to where Dan McKenzie's house was, so that they would not make a run on the wrong house, and the next morning, being the 26th day of November, at daylight, the pursuing parties surrounded Dan McKenzie's house and there arrested Joe Blake; tried to find the trail leading out from Dan McKenzie's, but were unable to do so, gave up the chase and went back; that they got a sorrel horse at Dan McKenzie's, which had been very badly ridden; had a white snip in his face. It was carried back to Canadian and put in Dick Bussell's livery stable, and Joe Blake was taken back to Canadian and put in jail, where he still remains; that in going out from Dan McKenzie's, witness came upon the trail of five horses going towards Dan McKenzie's house; that this was the same trail they had followed all the way from Canadian, except that a fifth horse had dropped in with the others and there were five horses instead of four. The fifth horse came in after they had crossed the Canadian river, between there and Dan McKenzie's; that subsequently witness arrested Jim Harbolt at Taloga, in Oklahoma, about the first of February, 1895; that witness had been active in the investigation of the matter, looking to the apprehension of the parties who had killed McGee, and had not learned anything about Harbolt's supposed connection with it or complicity in it until about that time; that there was no warrant or complaint against him, and that his name had never been heard of in connection with it until his arrest; that at that time Dan McKenzie had not made any statement of the names of the parties who the witness had trailed to his house, and the witness did not know or have any information as to any other name than Stanley up to that time; that Jim Harbolt was a small man,

weighed 140 or 145 pounds, five feet seven or eight inches high, dark complexion, dark eyes, black mustache, small feet; that the sorrel horse obtained at Dan McKenzie's was so badly ridden that he gave out before he was gotten back to Canadian.

L. J. Smith testified that he was deputy United States marshal in the Indian Territory, at Chickasha, and held that position in that locality for five years, during which time he had known the defendant; that in the early spring of 1893 defendant made a proposition to witness at Chickasha, to go into a scheme to rob the express, telling the witness that he, the defendant, would ship out a few cattle, get a little money, ship it in by express, mark the packages whatever amount they wanted, get some man to rob the train above Chickasha, and what he wanted the witness to do was to see another deputy marshal, to go in with them, who would take up the chase of the robbers, run them off and lose them, or report a running fight, and the defendant would collect the money from the express company, and divide the profits with the witness and the other parties to such scheme; that the defendant would sue the express company to collect the money; that at another time, at Duncan, the defendant also had another conversation with witness about the same matter.

F. J. Dodge testified that he resided at Kansas City, Missouri, and was special officer or detective of Wells-Fargo express, and investigated the matter connected with the attempted robbery of the depot at Canadian and the killing of Tom McGee; that he met the defendant at Canadian jail on Tuesday after McGee was killed, having come down from Kansas City; that witness told the defendant that he had investigated the shipment of money from Kansas City, and had found that he had sold some cattle to Drum-Flato Company a few days before McGee was killed, and that he had gotten a check therefor, and cashed it at the First National bank, and obtained five hundred dollars in one and two-dollar bills, which he had shipped by Wells-Fargo Company's express from Kansas City, on the 22nd of November, 1894, to Canadian, and that the packages had been counted in his presence and found to contain one hundred dollars each; that the matter had resulted in murder, and that witness had come to him, the defendant, to have a statement about the matter, and that he wanted him to tell the truth about it; that he told defendant that whatever he said to witness would be used in evidence against him if witness ever went to the front in this case; that the defendant said he wanted to tell the truth about it; that the defendant asked witness if anything could be done for him, to which the witness replied that he had no authority to make any promises; that he had not seen the District Attorney. Defendant then said that he wanted to do what was right about the matter, and that witness told the defendant he thought that would be the best thing he could do, to tell all he knew about it. Witness said that this statement was not obtained by any persuasion or promise or threats or fear; that there was no mob nor any indication of it; that defendant then told witness that Jim

Stanley, Bill Doolan and two other parties came to his house in the Indian Territory and proposed this scheme to rob the express company; that the two men besides Stanley and Doolan kept to one side, and that defendant did not know who these parties were; that he had his talk with Stanley; that they first proposed to furnish defendant with the money, and for him to go to Kansas City and ship the same to Canadian, and mark it as a large amount, but at defendant's suggestion to Stanley that it would be better for the defendant to ship cattle to Kansas City, and get the money that way, and ship it out; that the defendant was to ship the money, Stanley was to rob the train between Higgins, Texas, and Canadian, Texas. Defendant said that he was poor, and didn't have any money, and that he agreed to this; that they had two or three talks about it, and that he, the defendant, did not know for certain who was up there, at Canadian, except Stanley; that Stanley was to get the men to do the robbery, and that he, the defendant, did not know for certain who was with Stanley, but that if he could get out of jail, and get back down home, he could find out in a week, or such a matter. He said he was to leave with the cattle for Kansas City, about the 20th of November. Stanley and his party left, going across country, before that. He said that he done nearly all of his business with Stanley, but Bill Doolan was present with him. He said that he shipped out the cattle to Kansas City, and got the money, and went to the express office, got some envelopes, and shipped out five packages to Canadian, and marked them $5000 each; that he put $100 in each package; that he got on the same train which carried out this express, and came to Canadian on that train; that after he passed Higgins, and before he got to Canadian, he expected the train to be robbed, but when he got near Canadian, he became uneasy, for fear something had miscarried. He described Stanley as a tall, light complexioned man, weighing about 180 or 185 pounds, blue eyes. He said Bill Doolan was a small man, dark complexioned, probably five feet eight inches high, and that the other two men didn't come to the house, but staid out near the corral; that they were small men, one of them dark complexion, and the other not so dark; that he could find out who they were when he got back down in the country where he lived; that witness was again in the jail two days after that, in company with Mr. Hoover, whom he introduced to defendant. Mr. Hoover told defendant that he was engaged in the prosecution, and that any statement he made to him about the case would be used in evidence against him. Witness did not remain to hear the conversation between defendant and Hoover. Witness made no promise not to prosecute the defendant. That after witness had heard the statement of the defendant, he went down from the jail and met the defendant's brother, Sam, and told him what his brother George had told him (witness). Sam Isaacs said he would not believe it unless he heard it from George's own lips. Witness then went up to the jail with Sam Isaacs, and went in to where the defendant was, and stated to him that he, witness, had told Sam Isaacs what the defendant said, and

witness said to the defendant, "Now you can tell him yourself what you told me;" and that defendant did so, in substance; that nothing was said about any mob.

D. J. Young also testified that he was a member of the grand jury which found the indictment in this case, and that the grand jury used all means in their power to ascertain the names of parties who shot Tom McGee, and the only names they could get were those mentioned in the indictment, and that they could not find out, for certain, the name of the man who shot McGee.

The State next introduced in evidence the check given to the defendant by Drum-Flato Company for $683.60, for the cattle shipped by him to Kansas City, which check was cashed at the First National Bank of Kansas City, and identified by the witness, Fishburn.

The State introduced in evidence the five express envelopes identified by the witnesses as the ones in which the money had been shipped by the defendant.

Jim Stockton, for defendant, testified, that he was a guard on the express car that carried the money, and came through with it from Winfield Junction; that he was present at the depot at the time of the shooting of Tom T. McGee; that witness and N. J. Overstreet, A. B. Harding and Tom T. McGee were in the depot immediately before the shooting, and Mr. McGee stepped out at the waiting-room door near the corner of the depot, when the shooting began, and it was over within thirty seconds or a minute after he went out. As soon as it was over, McGee stepped back into the waiting-room, and hollered for the partition door to be opened, which led from the waiting-room into the depot office; that witness threw it open; that he did not remember exactly the position of all the parties at the time of the shooting; that the other men were in the depot, but he could not exactly tell where each one was at the time; that he was considerably excited; that the shooting was over before you could tell it; that witness saw the flash of the pistol shots, looking out of the east window of the depot office. Two or three shots were fired from about that locality. The flashes were going north. That witness was at the depot office next morning after the shooting, when the defendant and his brother came there after the packages. The packages had not been tampered with while being carried to Canadian; that witness heard the defendant say at the depot next morning after the shooting, that defendant had gone down to the mail car of the train while it was standing there at Canadian, before he went to the hotel to mail a letter. Witness stated that there was no shooting out by the bay window, and that nobody ran down the platform on the south side of the depot, that he heard.

N. J. Overstreet, for defendant, testified, that he was the telegraph dispatcher at Canadian at the depot November, 1894, and that the train came in at 7:45 or 7:50 p. m., on the night of the 23rd. He saw the agent bring some packages into the office and put them in the safe. That the train left about the time McGee came down to the depot; that he heard McGee

say that he would go out and look around, to see if he could see any suspicious characters, and that he had not more than stepped out of the door when the shooting began; that eight or ten shots were fired. The train had just pulled out. Stockton, Harding and witness were in the depot building at the time of the shooting. Witness did not hear any talking outside while the shooting was going on. The shooting appeared to be from the east end of the depot, and witness did not hear anyone running on the south depot platform.

Mary Ennis (colored) testified that she saw shooting at the depot on the night of November 23rd, 1894, and that, after five or six shots were fired, a man ran out of the privy, running down the depot platform toward the bay window, on the south side of the depot, and she heard him say, "Tom McGee, you d— son-of-a-b—, you are the man I am after," and commenced firing; that the man he was shooting at was near the bay window, on the west side of it, and that four or five shots had been fired before the man ran out of the privy and down the platform; that she saw four men, who did the shooting, run off from the south platform toward the coal chutes, but did not see any shooting at the east end of the depot, only in front of the bay window.

J. J. Southerland testified that he resided in Canadian, Texas, at the time of the killing of Tom McGee, and was in the hotel business there. That he had heard persons say they thought there was danger of a mob; that he saw the defendant the night Tom McGee was shot; that he registered at his hotel, told the witness he wanted a room, and that witness took him upstairs and showed him a room, and bade him good-night, after lighting the lamp for him, and stepped out and closed the door of the room; that that was between 8 and 9 o'clock, and just before the shooting.

George Baker testified that he was in the town of Canadian on the 23rd of November, 1894, cooking in the restaurant in Paul Hoeffle's saloon, south from the depot, on the corner of Main Street, next to the depot. That witness went to a switch engine, just east of the depot, before the shooting, and returned from the switch engine to the saloon, and when he had gotten about half way between the switch engine and the saloon, heard somebody say "Where you from?" or "Where you going?" or something like that, and heard something said about a s— of-a-b—, and then the shooting began; that witness saw one man shooting from a point three or four rails east of the depot, on the house track, one man shooting from the box car on the side track, south of the depot, and another shooting from a pile of shingles at a point south of the main track, and a little southeast of the depot, all of them firing in the direction of the east end of the depot; that there were eleven shots. Witness stated on cross-examination that he looked at the east end of the depot, next morning, for bullet holes, and didn't find any; that the voice he heard was at the east end of the depot, and McGee was near the corner of the depot, at the waiting-room door; parties looked to be shooting at him. Witness stated that he never had told anybody whom-

soever about what he had seen, for the reason that he didn't want to be a witness, but admitted that several persons were present when they were looking for bullet holes in the depot, and that he told them about seeing men shooting from the places he indicated. Witness then stated that he had told little Johnny Kirkham about it, and that he could not rememeber anybody but little Johnny Kirkham who was with him when he was looking for bullet holes in the depot. Witness said he saw Isham Anderson in the town of Canadian five or six days before McGee was killed; that Anderson was a tall, dark complexioned man, with sandy mustache, and clean shaved, when he saw him; that he had not seen him since the last time mentioned.

Ed Brainard testified that he was running a ranch for which Isham Anderson worked for about fifteen days, but that he had quit about the last of October, and witness had not seen him since. That when he quit work he had about three weeks' growth of beard; that he saw him at Canadian about the 1st of November, but hadn't seen him since that; that he never heard him say anything about McGee; that he saw him at Canadian after he had quit work; that he was armed, and he called McGee's attention to it.

Sam Cohen, alias Jew Sam, testified that he was at the Fay hotel on the night McGee was shot, and that he was out between the hotel and the depot and heard the shooting, and saw two men shooting near the corner of the depot, at the waiting-room door; that McGee and another man were shooting at each other. He saw the man who was shooting at McGee turn and walk down the east platform from the depot, to the road crossing, and then along the wagon road to the north, between the Fay hotel and the Chinaman's; that he was holding one elbow in the other hand; that witness asked this man what was the matter, and he replied that there was something wrong over at the depot, that they were shooting over there. He said this man was a good looking young man, with black hair, black mustache and black beard, and that he had seen him get off the train that day, which came in from the east; that he only saw this man and McGee shooting. The man shooting at McGee was not on the platform, but was at the northeast side of the platform and close to McGee; that there was no shooting at the southeast corner of the depot that witness saw; that he did not think McGee was more than six feet from the waiting-room door; that the man going between Fay's and the Chinaman's was not running, but walking an ordinary gait. Witness admitted that he gambled some, dealt some monte; that peddling was his business, and that he had run a knife board and ring game.

John W. Kirkham testified that he was in Paul Hoeffle's saloon at the time of the shooting of Tom McGee; that he was working around the saloon. Heard a shooting and went to the door; that he didn't count the shots, they were so rapid that he could not count them; that he could see the flashes of the pistols from over the end of a box car that stood between him and the depot; that the shooting didn't occupy over

eight or ten seconds; that he could not see the east end of the depot or the bay window, on account of the box cars; that the shooting appeared to be at the corner of the depot, at the east end, and near the bay window, but it might have been at the east end of the depot. Witness said he could not locate the position of the parties who did the shooting; that they were, he thought, out south of the bay window, might have been around at the east end; that he was in view of the shingle pile mentioned by witness, Baker; didn't see any flashes from any pistol from there; that he was in view of a point three or four rails' length east from the depot, on the house track; that he thought he could have seen any shooting if it had been done from there, and he did not see any from that place; that there was no shooting from out in that direction, towards the depot; that he heard somebody running on the platform towards the west; that it was on the south platform after the shooting; that he didn't see any of the parties who ran that way, and didn't know what direction they went. As far as the witness saw, the shooting might have taken place where McGee said it did; that he didn't look for any bullet holes in the east end of the depot, and that George Baker did not tell him anything about anybody shooting from the shingle pile or from the other points which Baker named; that if anyone had walked down to the crossing east of the depot after the shooting, witness thought he would have seen them by the light as they came between him and the Fay hotel.

Hon. B. M. Baker, District Judge, testified that he heard the shooting which resulted in the killing of McGee, and ran immediately to the depot, where he arrived within seven minutes; that he saw a number of persons there, among them Bob McKay and the deceased, McGee, in the freight room of the depot. Witness testified to statements made by McGee at that time, substantially as testified to by the other witnesses who heard McGee's statements. Witness and other citizens arranged to have the money counted; sent parties to defendant and his brother, Sam, to know if they would permit the counting of the money that had been left in Chambers' safe, as witness had been informed. It was then agreed that the money should be counted on Sunday afternoon at 4 o'clock by a citizen's committee. Witness found the people very much excited over the loss of a good man, but did not see any indication of any mob or any danger of any violence whatever; did not regard it probable. Witness heard the shooting, and said he knew the locality of the privy near the depot, and that a person could not have run out of the privy and down to the depot during the time the shooting was going on.

George Aikens testified that he was with Tom McGee on one occasion when he arrested the man, Isham Anderson, and put him in jail, and that Anderson's mother brought a grip to the jail, which McGee examined, and Anderson became mad at that, and said he would kill any son-of-a-b— who suspected his mother; that he thought Anderson a man who would carry out a threat. That was in 1888.

O. L. McClung testified to an alibi for Jim Harbolt, and that he was at Taloga, 125 miles from the place of the killing, at such a time that he could not have been at the place of the killing.

Burt Sexton, John Dillon, L. P. Bodine, J. W. Haddox, Alex McGonnegal, G. W. Kopp and W. N. Kopp also testified to an alibi for Jim Harbolt. Walter Christian testified to an alibi for Tulsey Jack and Bitter Creek. John Shoemaker testified to an alibi for Tulsey Jack and Bitter Creek. Peter Larriston and Wm. Lout testified to an alibi for Jim Stanley.

Sam Isaacs, a brother of the defendant, testified that he met D. J. Dodge at Canadian, Texas, the first Tuesday after Tom McGee was killed, and went with said Dodge to the jail, to see his brother, the defendant; that Dodge told the defendant to state to witness what he had stated to him, Dodge; that he did state that Jim Stanley had come to his house in the Territory and proposed for the defendant to go to Kansas City and ship out $25,000 to Canadian, Texas, and that he (Stanley) would take it off the train, and all the defendant would have to do would be to collect the money back from the express company; that the defendant did not speak of any other person but Stanley, in connection with the matter; that witness asked the defendant why he had made such statements to Dodge, and he said because Dodge told him there were fifty men on the outside of the jail, who would tear the jail down and mob him if he did not confess; that witness then turned to Dodge and asked him if he told the defendant that, and he said he did; that Dodge said the defendant was not the man he wanted, but that if he would tell who the guilty parties were, and help catch them, he would help him to get out of jail. Witness, on cross-examination, denied that he had asked Winsett, the clerk in Chambers' store, to get the money out of the safe, after it was agreed to count it.

The State introduced, in rebuttal, the testimony of C. C. Quillen, L. P. Hicks, Thomas Smith, A. C. Shaw, John Williams, who testified that the reputation of the above named alibi witnesses, for truth and veracity, was bad.

Deputy Marshal Banks testified that he was with the posse who killed Tulsey Jack; that he was killed in a running fight in the Indian Territory, while being trailed away from a train robbery on the Rock Island railroad.

F. J. Dodge was recalled, and testified that Sam Isaacs did not make any statement to him at the jail with reference to any mob, and that he did not make any such statement to the defendant, and that no such conversation was had in his presence. Witness stated that the defendant stated to him that he could prove the agreement between him (defendant) and Stanley, by the witness, Pete Larriston.

R. M. McKay was recalled, and testified that the old negro, Mary, was at his house twenty-five or thirty minutes after the shooting, and was inquiring of him about it, but did not mention anything about having seen any of it; that Jew Sam told him (witness), next morning after

the shooting, that the man who passed between Fay's hotel and the Chinaman's, was running, and that Jew Sam did not tell witness anything about that man having his arm in his hand, or about him having any beard on his face, or about him checking up.

Dick Bussells testified that he was one of a committee to count the money, and that he saw Sam Isaacs about two o'clock in the afternoon, before the money was counted, and heard him tell Winsett, the clerk in Chambers' store, that he wanted to get the packages out of the safe, and Winsett told him he could not get them.　Witness stated that Captain Arrington put the sorrel horse in his stable, that he brought back from McKenzie's, and that this horse was seen at his stable by witnesses, Webb, Walton and Conaster, and was pointed out by witness, Bussells, to them.

The evidence further shows that some time during the month of November, 1894, Jim Harbolt had been away from his home, which was near Taloga, Oklahoma, and had been gone several days, riding a bay horse; that when he came back this horse had been very badly ridden; that G. W. Kopp, a special friend of Jim Harbolt, who interested himself in hunting up alibi testimony for said Harbolt, rode a bay horse belonging to said Harbolt, to the house of J. M. Webb, and that this horse is identified by Webb as being one of the horses ridden by one of the four men whom he met coming to Canadian, on the day Tom McGee was killed; that Harbolt made the statement, long prior to his arrest, and on one occasion after he had returned from Chickasha County, being the same locality where the defendant resided, that he, Harbolt, had heard that he was wanted at Canadian, for the murder of Tom McGee, but also stated that he would not go to Canadian for a thousand dollars.

The testimony also showed that several alibi witnesses were persons who had been indicted and prosecuted for theft, and other offenses, and the cross-examination tended to impeach them.

*Plemmons & Veal, Ownley & Johnson, Oeland & Littleton,* attorneys for appellant.—The acts and declarations of Tulsey Jack, at Taloga, Indian Territory, thirty-seven days after the alleged conspiracy had ended, and the acts and declarations of the said Tulsey Jack, Bitter Creek, Jim Stanley, Jim Harbolt, and Joe Blake, at the residence of the witness, McKenzie, three days after the conspiracy had ended, were introduced by the State and relied upon to obtain a conviction in this case.　If we did not apply the ordinary rules excluding the acts and declarations of a co-conspirator, after the conspiracy has ended, either by accomplishment or abandonment, then this testimony would be powerful in producing a conclusion of guilt, and inasmuch as these rules in the admission of these acts and declarations were disregarded, they were equally powerful in producing that same fact upon the minds of the jury in the trial of this case.

The statement or declaration of a co-conspirator, after the conspiracy

is ended, either by accomplishment or abandonment, even if the abandonment be voluntary, or compelled, are not admissible in evidence against any person but himself, though the object of the conspiracy be not ended, the acts and declarations of a co-conspirator are not evidence against another co-conspirator, unless they are in furtherance of the common design. McKenzie v. State, 32 Tex. Crim. Rep., 568; Cohea v. State, 11 Tex. Crim. App., 153; Ricks v. State, 19 Tex. Crim. App., 308; 8 S. W. Rep., 510; 2 S. W. Rep., 627; Amer. and Eng. Ency. of Law, Vol. 4, p. 634; Martin v. State, 30 S. W. Rep., 222.

The court erred in permitting the State's witness, Dan McKenzie, to testify, over defendant's objection, that the signature on the end of the packages shipped from Kansas City to Canadian was, in witness' opinion, the same signature that was to the letter shown witness at Taloga by Tulsey Jack, because said witness had not qualified as an expert, had not testified that he had ever seen Isaacs write his name; had not testified that he was even familiar with the defendant's name or the writing thereof, or that he had ever seen the defendant write at all.

To entitle a witness to be examined as an expert in the comparison of handwriting, he must, in the opinion of the court, have special practical acquaintance with the immediate line of inquiry, and the question of his competency as such expert, is one for the court, and not the jury, to determine. Whar. Crim. Ev., Sec. 406; Jones v. State, 7 Tex. Crim. App., 457; Speiden v. State, 3 Tex. Crim. App., 156; Heacock v. State, 13 Tex. Crim. App., 130.

The court erred in that part of its charge under paragraph 18, in which he tells the jury, "it is immaterial whether the crime actually committed was done while carrying out or attempting to carry out the original plan as at first contemplated, or in the manner, or at the place, or by the persons, as at first contemplated. It is sufficient if the same ultimate object was being pursued by the conspirators."

Where the original plan of the conspiracy is changed and the place of its carrying out is changed, and where the persons agreed upon to carry it out are changed, it seems to us that the conspiracy is destroyed; and if any crime is committed, it is in pursuance of a new conspiracy, composed of different persons, to be carried out by them at a different time and place.

When the guilt of the accused is dependent wholly upon circumstantial evidence, it is the duty of the court, in its charge, to apply the law applicable to such evidence, whether requested to do so or not, and a failure to do so is fundamental error, and will require a reversal of the conviction, although the error be not excepted to. Especially is it the duty of the court to give such a charge when requested to do so by the defendant in a special instruction which embodies the very essence of the law upon that subject, as approved by the repeated adjudications of our highest courts.

The only reason that can be given in explanation of the court's refusal to charge on circumstantial evidence is, that the defendant has

made a confession which obviates the necessity of such a charge, and this reason, we think, is insufficient as a legal explanation. If we look alone to the defendant's confession and undertake to gather such facts as will show his guilty complicity in the murder of Tom McGee, we can find nothing save and except an admission by him that he shipped the money to Canadian; that he falsely endorsed the packages, and that he had an agreement with his fellow-conspirators that the train should be robbed between Higgins and Canadian by them, and in this same confession the defendant stated that after the train had passed the place where it was agreed the robbery would be committed, he had an apprehension lest the scheme had in some way miscarried. He did not confess to a knowledge of any robbery which was to take place at Canadian. He did not confess to any character of criminal participation in the murder. He did not confess to a knowledge of who the persons were that committed the homicide, and no where in his confession, indulging the greatest latitude in its construction, can there be found any admission which would include or insinuate any knowledge of any homicide contemplated by anybody. Again, the question as to whether or not this confession should be considered by the jury, being one which depended upon how they should construe the declarations and conduct of the witness, Dodge, toward the defendant, render a charge upon circumstantial evidence absolutely imperative, because if the jury should decide that the defendant's confession was not voluntary, and was made by him without first being cautioned, as the law requires, then the case is one wholly depending upon circumstantial evidence for its support, and even in that view of the case a charge should have been given to the jury by which they should have been guided according to the law governing circumstantial evidence. Again, the confession of the defendant considered most strongly against him, means simply that he had shipped $500 in five packages of $100 each, consisting of one and two dollar bills. That he falsely endorsed on each of these packages a valuation of $5,000; that it was his intention and the intention of his fellow-conspirators to hold up the train before it reached Canadian and rob the express messenger of these packages, and afterwards sue the express company for the value shown to be endorsed on said packages, towit: $25,000. Now let us suppose that this scheme had been successsfully carried out, and that the defendant and his fellow-conspirators had been apprehended, arrested and were put on trial under a charge of robbery. If we look to the statutes defining that offense, we find it as follows: Article 722. "If any person by assault or violence, or by putting in fear of life or bodily injury shall fraudulently take from the person, or possession of another, any property with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary for life, or for a term of not less than five years." On a further examination of the decisions of this State announcing the law and in the construction of said statute, we find that in the case of Barnes v. State, 9 Tex. Crim. App., 128, the court said: "An indictment for robbery must clearly show upon its face by appro-

priate averment that the property taken belonged to some person other than the accused, or that the party deprived of the possession through violence was entitled to such possession; the accused the owner of property, entitled to its possession, cannot be held guilty of robbery, although he takes it from another by violence and by putting in fear of life." Again, as robbery is a species of theft we must look to Article 730, relative to the guilt of a party who fraudulently takes property belonging to himself, and we there find, "that no person can be guilty of theft by taking property belonging to himself, except in the following case, to-wit: (1) Where the property has been deposited with the person in possession as a pledge or security for debt. (2) Where it is in the possession of an officer of the law by process from a court of competent jurisdiction. (3) Where the property is in the possession of an executor or administrator for the purpose of administration. (4) In all other cases where the person so deprived of possession is at the time of taking lawfully entitled to the possession thereof as against the true owner."

Again, the definition of robbery, as above quoted, includes as an essential element of the offense an intent upon the part of the person committing a robbery, to appropriate the property to his own use. The question then arises in this connection, could the defendant and his fellow-conspirators have been legally convicted of robbery, if they had been successful in the prosecution of their scheme? The confession of the defendant only reaches to a robbery which had for its object the taking of the five packages of money. The undisputed evidence is, that this money belonged to and was the property of the defendant, and that the express charges for its shipment had been prepaid by him at Kansas City.

It was not in the possession of the express company under any of the exceptions named in Art. 730, of our Criminal Code, and the only one of those exceptions which could in any wise bear upon the question at all is No. 4, and it only says that a party may be guilty of the theft of his own property when a person deprived of possession is lawfully entitled to such possession against him.

In this case, we think that the defendant or his fellow-conspirators, whose acts in law would be his acts, and whose responsibility in law would be his responsibility, were entitled to the possession of this property at any place or time, and if they fraudulently took possession of said property from the express company, they could legally be guilty of nothing more than a trespass or an assault upon the messenger, agent or person in charge of same. If this be true, then the confession of the defendant was only one among a number of disconnected circumstances indicating his participation in the offense charged, and, therefore, did not relieve the court of the duty of submitting to the jury a charge upon circumstantial evidence.

As to charge on circumstantial evidence, see, Willson's Crim. Stat., § 2342, and authorities cited thereunder. As to question of the effect of defendant's confession, see, Barnes v. State, 9 Tex Crim. App., 128;

Smedley v. State, 30 Texas, 214; Childs v. State, Sup. Ct., Austin term, 1875; Arts. 722 and 730, Penal Code.

*G. W. Walters*, District Attorney; *Carter & Cowan, H. E. Hoover* and *Mann Trice*, Assistant Attorney-General, for the State, filed a most able and elaborate brief, in which they take up the charge of the court paragraph by paragraph, and cite the authorities sustaining each paragraph, and which, the Reporter regrets, that, on account of its length, he is unable to reproduce that portion of the brief here.

There was no error in the court's refusing to give a charge upon circumstantial evidence. It is only where the evidence is wholly circumstantial that the charge on circumstantial evidence is necessary. Wilson v. State, 21 S. W. Rep., 361; Ellis v. State, 24 S. W. Rep., 894; White v. State, 32 Texas Crim. Rep., 625.

This was not a case of circumstantial evidence wholly, because (1) George Baker and D. S. Cohn both testified to seeing the shots fired between the deceased and the party who killed him; (2) the declarations of the deceased himself detail the circumstances of the killing; (3) the defendant's confession shows that he was in a conspiracy with parties to effect the robbery. It is true that without the aid of circumstantial evidence the defendant would not have been shown to be guilty; so it is in a case where one is charged with theft, and the taking is admitted. In such a case it is held not necessary to give a charge on circumstantial evidence. The mere taking does not constitute theft. It is the fraudulent taking with intention to deprive the owner of the property, to appropriate it to the use of the person taking, which constitutes the essential ingredient of the offense. This essential ingredient may be proven by circumstantial evidence, and if the one fact of taking be admitted by the defendant, then a charge on circumstantial evidence is not required. So in this case, the corpus delecti was proven by eye witnesses to the transaction. The fact of a conspiracy to commit the crime of robbery was admitted by the defendant, and his participation in a part of that conspiracy proven by direct testimony. Hence it is not a case dependent on circumstantial evidence, and no charge upon this subject was necessary.

This remarkable case presents a case in which the person convicted did not commit any of the criminal acts occurring at the very place of the killing, but whose sole will brought it about by a series of criminal conspiracies and acts performed to carry out the design, on part of himself and his co-conspirators.

In our view of the case it is quite immaterial whether the State's theory be correct in point of fact as to the names of the parties who were present at the killing and performed that bloody deed; certain it is that whoever it was whose guilty hand did that deplorable act, he was a conspirator with the defendant to rob the express company of the $500 in order that the defendant might call for his money and collect $25,000 from the express company.

The fact that defendant was not at the depot at the time of the kill-

ing, but in bed (if that be true) at the hotel, does not render him any the less a principal. He was evidently at Canadian to call for his money, and no doubt to let his guilty participants know he was there and that the money was there. He could not well have notified them otherwise, and the proof shows that he said next morning that after getting off the train he went forward to mail a lettter on the train, thus passing the express car. He was waiting in the hotel to carry out the other acts necessary to complete the plan. What would it have profited him if his part were then complete; what would he have gained? He could have recovered $500, but would also have lost that amount. Evidently he was to collect his $25,000, and probably to divide it with his pals, in order to complete the conspiracy. Then he was doing the part to be performed by him at the time of the killing. His mind, his intent, his expectation concurred in that of his co-conspirators to rob, in carrying out which the murder was committed, and he was thus a principal to the killing of Tom T. McGee. As said in Berry v. State, 4 Tex. Crim. App., 492: "We do not understand that it is necessary in order to constitute this relation to the crime, that all should be actually present and acting at one and the same time, but that the whole be in pursuance of a plan in which the minds, and not the hands, of all concur."

The State's theory, therefore, was that the defendant was a principal, but as the indictment charged him, also, as an accomplice, the question as to whether he, being absent, was not a principal, becomes unimportant, since he performed all the acts necessary to render him an accomplice.

HURT, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal. The indictment contains three counts. The first count charges appellant as a principal; the second charges Jim Harbolt with the murder as principal, and the appellant, as not being present, advising or encouraging Harbolt to commit the murder—in other words, charges the appellant as an accomplice to Harbolt in the murder; and the third count charges him as an accomplice to the murder of McGee, committed by some person, to the grand jurors unknown. There is a general verdict of guilty, without stating upon which count the verdict is based. This is sufficient, and the verdict can be applied to the count sustained by the proof. It appears from the record that appellant, in Kansas City, Missouri, purchased a large number of small currency bills, and placed them in five packages. The packages were sealed up, each marked $5000, and were placed with the agent of the express company at Kansas City, for shipment to Canadian, in Hemphill County, Texas. When the train carrying the money arrived at Canadian, it was dark, and the deceased, McGee, had been requested by the agent to be at the depot (he being informed of the fact that the company had in its possession the money above alluded to). McGee was at the depot, and, as he stepped out of the door of the of-

fice, saw a man, and hailed him, and stated he wanted to see him, where-upon the strange man began firing upon him, and at the same time shots were fired from several different directions at McGee. McGee was killed. Isaacs confesses that he purchased the small bills; that he had placed them in five different packages; that he had marked each as if it contained $5000, and placed them with the express company at Kansas City, to be shipped to Canadian, Texas; that he entered into the con-spiracy and agreement with Jim Stanley, Bill Doolan, and two other parties; that they came to his house, in the Indian Territory, and pro-posed to furnish defendant with money for him to go to Kansas City, and ship the money to Canadian, Texas, indorsing on the packages so ship-ped, a much larger amount than they really contained; that defendant suggested to Stanley that it would be better for him (defendant) to ship some cattle to Kansas City, and get the money that way, and ship it out. It was further agreed that defendant ·was to ship the money, and Stanley was to rob the train between Higgins and Canadian. Defend-ant said that he was a poor man, and, having no money, agreed to this; that there were two or three talks, between themselves, about this matter. Defendant said that he did not know for certain who was at Canadian except Stanley, that Stanley was to get the men to do the robbing; that he (defendant) was to leave with said cattle for Kansas City about the 20th of November. Defendant further stated that he did nearly all of this talking with Stanley, but that Bill Doolan was with them; that, in accordance with this agreement, he shipped the cattle to Kansas City, got the money, went to the express office, got the envelopes, ascer-tained the rate on money, paid the express charges, amounting to about $30; that he shipped it in five packages to Canadian, and marked each of them $5,000; that he put $100 in each package, making $500 in all; that he got on the same train which carried out this express, and came with it to Canadian; that he expected the train to be robbed between Higgins and Canadian, and after passing Higgins and getting near Canadian, he felt uneasy, for fear that something had miscarried. The description given by appellant of Jim Stanley, Bill Doolan, and the other two men, coincides with the description given by the other wit-nesses of these parties. At the time of the shooting, appellant was in the hotel, which is situated about 250 or 350 yards from the depot at which the shooting took place. The State's theory of the case is, that Stanley, or perhaps Doolan, or Harbolt, did the killing, in the attempted perpetration of robbery. It is not necessary for us to decide whether appellant was a principal or an accomplice. It is evident that he was, at least, an accomplice to the murder. We have his confessions to that effect. Now, to convict under this indictment, proceeding upon the theory that he was an accomplice to the murder, the State must prove that Harbolt or some person with whom appellant conspired to com-mit the robbery killed the deceased. It is not necessary to prove that the person or persons killing the deceased entered into a conspiracy or agreement with the appellant to rob the express company. If those with

whom he conspired employed others to attempt the robbery, appellant is responsible to the same extent as if he had made the agreement with them himself. Having set in motion that which resulted in the death of the deceased, he would be an accomplice to any person, whether instigated by himself directly, or whether instigated by those with whom he had conspired. Having positive proof that he had entered into the conspiracy to rob the express company, the next question that presents itself is this: Is there positive proof that some person killed McGee (the deceased), in the attempt to rob the express company, who was a co-conspirator with the defendant, or who had been employed by those with whom appellant had conspired. Tulsey Jack confessed to McKenzie that he was present at the homicide. McKenzie testified: ''While talking about the death of McGee, Tulsey Jack asked me what I had heard about it. I told him I had heard it two or three different ways, and he said, 'Yes; so have I.' They claimed that there were seven or eight of us at Canadian, who robbed the train, but didn't any of them have it right. There was only four of us. Three went up to the depot, and Joe Blake stayed back with the horses. He said that son-of-a-bitch, George Isaacs, tried to swindle them and the railroad company, too; that he promised to ship $5000, and sent only $500." The real name of Tulsey Jack was Will Blake. If this confession be true, then the State has positive proof that Blake, alias Tulsey Jack, was present when McGee was killed; that he was there for the purpose of robbing the express company of the money deposited with it by appellant at Kansas City for shipment. The next question arising is: As the appellant, in his confession, does not name Tulsey Jack as one of the conspirators, have we positive proof that Tulsey Jack was a co-conspirator with appellant, or that he was employed by some of those with whom appellant had conspired, to-wit: Jim Stanley, Bill Doolan, or others? If there is no positive proof of this fact, then this is a case depending upon circumstantial evidence, because we might concede that there is positive proof that Tulsey Jack was present and a principal in the killing of the deceased; but, if the proof fails to connect appellant with those who did the killing, he is not responsible for the homicide, though he had conspired with Stanley, Doolan, and others to rob the express company. We do not wish to be misunderstood. If appellant entered into a conspiracy with Jim Stanley, Bill Doolan, and others to have the train robbed, and they attempted to rob the train, and, in doing so, killed McGee, appellant would be guilty of the murder. If those with whom he conspired did not kill McGee, were not present at the time of the killing for the purpose of engaging in the robbery, but some person instigated by them was attempting to rob the express company, and the murder occurred, appellant would be as guilty as if McGee had been killed by some person with whom he had conspired to have the express company robbed. But if the testimony establishing the fact that McGee was killed by some person with whom appellant had conspired, or who had been employed by some of the co-conspirators, does not

amount to positive proof, then this is a case of circumstantial evidence, and the court should have given a charge upon such a case, especially when requested by the appellant. Now, the question is: Is there positive proof that some one killed McGee who had been inspired to do so by appellant, or by some of his co-conspirators? Appellant wrote Tulsey Jack a letter, after he had been arrested and liberated. The witness, McKenzie, saw the letter, and the name signed thereto was George Isaacs. McKenzie swears that it contained, in substance, the following: "That he (Isaacs) had got out all right, and had given nothing away." While this may be circumstantial evidence, or, in other words, it may not be a direct confession connecting appellant with Tulsey Jack, who had confessed that he participated in the attempt to rob and murder, yet but one conclusion can be made from the statement contained in the letter. There is no danger of drawing a wrong conclusion from the statement. Appellant, in that letter, referred to nothing else except the robbery, the murder, and the murderer. Now, the danger in circumstantial evidence consists in drawing improper conclusions from the facts sworn to, but this danger cannot ·exist in this case. We have been discussing the question as if the State relied alone upon connecting Tulsey Jack with the murder as a principal, and by the letter connecting the appellant with Tulsey Jack. The State was not forced to do this. Appellant states positively and unequivocally that Jim Stanley, the man with whom he conspired, was present when McGee was shot. "Defendant said that he did not know for certain who was at Canadian, except Stanley," referring to the time and place of the robbery, at the time McGee was killed. He was certain that Stanley was there, but uncertain as to any one else being there. Now, the proof shows that there were four men engaged in the attempted robbery. Defendant shows that he got off the train at the depot at which McGee was killed, before the attempted robbery. He is certain that Stanley was there. This is perfectly reasonable. No doubt, he saw Stanley after he left the train, and before he went to the hotel. That Stanley was there is established beyond any sort of doubt by the circumstances of the case. He was seen late in the evening going there, and was followed the next day by Capt. Arrington, back to the Indian Territory, and identified as one of the men stopping at McKenzie's. Then there is positive proof that, at least, one of the parties with whom he had entered into the conspiracy to have this robbery effected was a principal in the murder of McGee, whether he shot him or not. We are of opinion that this is not a case depending solely upon circumstantial evidence.

The State introduced in evidence the envelope in which the money was placed at Kansas City for shipment. Isaacs, the appellant, had signed his name upon the envelope. This was proved by a witness who saw him sign his name. This envelope was placed in the hands of McKenzie while on the stand. On examining the signature of George Isaacs on the envelope, he was asked how it compared with the signa-

ture to the letter that Tulsey Jack showed the witness at Taloga, which purported to be signed by the defendant. The witness replied that, "in my opinion, the signature was the same as the one I saw to the letter shown me by Tulsey Jack at Taloga." Appellant objected, "because the witness is not shown to have ever seen Isaacs write his name, is not qualified by counsel as an expert, or being in any way familiar with Isaacs' handwriting, or any one else's." The bill fails to show that the contents of the letter went to the jury. This is necessary. See, Burke v. State, 25 Tex. Crim. App., 172; Jacobs v. State, 28 Tex. Crim. App., 79; Jackson v. State, 28 Tex. Crim. App., 143. The bill fails to show that McKenzie was not qualified or competent to testify as to the handwriting of the appellant. It simply shows that appellant made this objection. To be a good bill, it should show that evidence was not adduced showing that McKenzie was competent as an expert, or that he had seen the appellant write, or that he was familiar with the handwriting of the appellant, and should have also shown that the contents of the letter went to the jury. See, Smith v. State, 4 Tex. Crim. App., 626; Hennessy v. State, 23 Tex. Crim. App., 340; Ezzell v. State, 29 Tex. Crim. App., 521. Counsel for the appellant contends that the court erred in charging the jury that, if the murder was committed in the attempt to rob, it would be murder of the first degree. Counsel presents this question in another form on motion for a new trial, and contends that the proof failed to show that the murder was committed in the attempted robbery. If the evidence fails to show an attempt at robbery, appellant is not guilty of anything at all. The question, therefore, is: "Does it establish the fact that this murder was committed in the attempt to rob? Four men had ridden eighty to one hundred miles, armed to the teeth, well prepared for traveling; surrounded the depot for no other purpose on earth than to rob the agent of the money shipped by the appellant to Canadian. When the deceased stepped to the door, and asked one of them to stop, that he wanted to see him, he was fired upon from different directions, and killed. Now, it is contended by the appellant that technically this was not an attempt to rob; that it was simply a preparation to rob; that the proof carries it no further. This may be true, but for their presence, their conduct— all being in furtherance of the conspiracy to rob—this homicide would not have occurred. They were in the commission of a felony. That felony was robbery, and their acts were so closely connected with the robbery as to bring about and produce the conflict which resulted in the death of the deceased. Deceased made no attempt to arrest anybody. He simply remarked to one of the parties that he wanted to see him, and the firing commenced. We believe, within the meaning of Art. 711, Rev. Penal Code, 1895, that what was done by the parties there was an attempt at robbery, within the meaning of that article, and that there was, therefore, no error in so instructing the jury, and in refusing to grant a new trial, because the attempt at robbery was not proved. There are some fifty bills of exception and assignments of error in the record, and we have

carefully read them, and consider none of them well taken. We have discussed the questions raised by the appellant which we think worthy of consideration. Finding no errors in the record, the judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing filed after the above opinion was handed down, was overruled without a written opinion.—Reporter.]