Marcus DRUERY, Appellant,

v.

The STATE of Texas.

No. AP–74912.

Court of Criminal Appeals of Texas.

April 4, 2007.

Rehearing Denied June 27, 2007.

Roy E. Greenwood, Austin, for Appellant.

Douglas Howell, III, Asst. D.A., Bryan, Matthew Paul, State's Attorney, Austin, for State.

### *OPINION*

KEASLER, J., delivered the opinion of the Court, in which MEYERS, PRICE, WOMACK, HERVEY, HOLCOMB, and COCHRAN JJ., joined.

In December 2003, a jury convicted Marcus Druery of a capital murder committed on October 31, 2002.[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Druery to death.[2] Direct appeal to this Court is automatic.[3] After reviewing Druery's twenty-one points of error, we find them to be without merit. Accordingly, we affirm the trial court's judgment and sentence of death.

---

1. TEX. PENAL CODE ANN. § 19.03(a).

2. TEX.CODE CRIM. PROC. art. 37.071 § 2(g).

3. TEX.CODE CRIM. PROC. art. 37.071 § 2(h).

## Statement of Facts

On October 30, 2002, Druery went to Skyyler Browne's apartment on the Texas State Technical College campus in Waco where both were students. Browne was commonly known by his nickname "Rome." Druery asked Rome to travel with him to Bryan; Rome hesitated but eventually agreed to go. Rome, who was known to have sold marijuana, took his cell phone, $400 to $500, his gun, and some marijuana. No one at the school ever saw him again. Druery later told a Texas Ranger that, after he and Rome had traveled from Waco to Bryan, they partied into the night, but Rome wanted to go home. Druery recounted to the Ranger that Rome called a girlfriend, and the girlfriend picked him up from the Contiki Club in an orange Cadillac. Law enforcement, however, was never able to locate an orange Cadillac.

Joquisha Pitts and Marcus Harris told a different story. Pitts was Druery's former girlfriend, and Harris was Druery's younger friend who was still in high school. Pitts recounted at trial that she had known Rome for only a couple of days when she witnessed his murder. She accompanied Druery and Rome to the Contiki Club, and on the way, the group picked up Harris, as well as some ecstasy tablets and some embalming fluid, which is put on cigarettes and smoked to produce a high. Harris recounted at trial that this was his first meeting with Rome. Around 1:00 to 1:30 a.m., at Druery's suggestion, Druery, Rome, Pitts, and Harris left the Contiki Club to go to rural property owned by the Druery family. Pitts drove Druery's car as Druery navigated because she had never been there before. Neither Pitts nor Harris was aware of Druery's plans.

During the drive to the country, Druery claimed that someone was following them, and he repeatedly asked Rome for his gun so he could shoot whomever it was. Rome refused. Once at the property, Druery unlocked the gate and drove the group the rest of the way to a stock pond. Using the vehicle's headlights for illumination, each member of the group took turns shooting Rome's gun at bottles they had thrown into the water. At this time, Druery called Pitts to the car and told her he was going to kill Rome, saying he wanted Rome's "stuff." Pitts reminded Druery that Druery had a two-year-old son, and she ultimately believed that Druery was "just playing."

After he shot the gun, Druery claimed that the ammunition had run out, and he returned to the driver's seat of the car. Pitts saw that Druery was taking bullets from the car's console, wiping them clean with a rag, and placing them in the pistol's magazine. Druery then called Harris to the vehicle, telling him that he planned to shoot Rome, but Harris believed that Druery was "tripping" on embalming fluid that he had smoked. Druery then ordered both Pitts and Harris to sit in the car.

Standing near the pond, Rome pulled his jacket or a hood over his head to block the wind as he attempted to light a pipe or cigar filled with marijuana. Druery skulked toward Rome under the cover of darkness, held the gun within six inches of Rome's head, and fired. As Rome's body fell, Druery fired a second shot into Rome's neck, and then he fired a third shot into Rome's body as it lay on the ground. Pitts and Harris began to cry and scream, and both saw Druery kneel over Rome's body. Druery returned to the vehicle with Rome's cellular phone, money, marijuana, and gun. He attempted to calm his hysterical companions by giving each forty dollars.

Soon thereafter, Druery obtained some gasoline (perhaps with Harris's assistance) and poured it on Rome's body. He set it ablaze, and the three left as the body

burned. During the drive, Druery instructed Pitts and Harris on how to respond to questions about Rome. He told them to say that Rome's girlfriend picked him up in an orange Cadillac to take him to get his sister in Washington D.C. and that they didn't see him again. The next day, Druery returned to the pond with Pitts and two others, burned the body a second time, and threw the body into the pond. Later, Harris assisted Druery in disposing of the murder weapon.

Pitts eventually went to the police and told them that she was scared and wanted to get it off her chest. Harris told authorities that he thought he would die because he believed Druery would not want to leave any witnesses to the killing.

### Accomplice Witness Testimony

Druery's points of error one through nine are related. In points of error one and three, Druery asserts that the evidence is insufficient to prove that he committed the underlying predicate felony offense of robbery during the course of the commission of murder. He argues that the only evidence he committed robbery came from two witnesses, Pitts and Harris, whom he maintains were accomplice witnesses as a matter of law. He then reasons that because of the witnesses' status as accomplices, the accomplice witness rule,[4] which requires corroboration of an accomplice's testimony by other non-accomplice evidence that tends to connect the defendant to the charged offense, also requires that the testimony of Pitts and Harris concerning the underlying robbery be corroborated. Druery contends that such corroborating evidence concerning the underlying robbery is wholly lacking.

In point of error two, Druery urges us to overrule our previous holding in *Holla-*

*day v. State*[5] that the accomplice witness rule does not require the non-accomplice testimony to corroborate a defendant's connection to the specific element that raises the offense from murder to capital murder. Here, the specific element is the underlying robbery, which Druery claims in points of error one and three is not corroborated by non-accomplice witness evidence. In points of error four and five, Druery contends that the trial judge erred when he refused to instruct the jury that Pitts and Harris were accomplices as a matter of law.

In points of error six and seven, Druery contends that the trial judge's instruction to the jury regarding whether Pitts and Harris were accomplice witnesses as a factual matter was constitutionally inadequate. He argues that the instruction failed to provide sufficient guidance to allow the jury to reliably ascertain the witnesses' status. And in points of error eight and nine, Druery argues that the trial judge's instruction allowing the jury to determine whether Pitts and Harris were accomplice witnesses as a factual matter constituted an improper comment on the weight of the evidence.

All of these claims rest upon the threshold issue of whether Pitts and Harris were accomplices—either as a matter of law or of fact—to the capital murder or a lesser-included offense of the capital murder. If they are not accomplices, then there is no error in the trial judge's refusal to instruct the jury that the witnesses were accomplices as a matter of law. Also, if Pitts and Harris are not accomplices, then the trial judge's instruction regarding accomplice witnesses as a matter of fact was superfluous and did not harm Druery. Indeed, such an instruction could only

---

**4.** TEX.CODE CRIM. PROC. art. 38.14.

**5.** 709 S.W.2d 194, 199 (Tex.Crim.App.1986).

benefit him because it allowed the jury to require corroboration of the witnesses' testimony if it believed that the witnesses were accomplices to Rome's murder.

Similarly, if Pitts and Harris are not accomplices, then the superfluous accomplice witness instruction as a factual matter in this case cannot be considered an improper comment on the weight of the evidence. Again, the instruction could only benefit Druery by requiring additional corroborating evidence that would otherwise not be required. Last, if Pitts and Harris are not accomplices, then a review to determine whether non-accomplice evidence sufficiently corroborated their testimony is not applicable, and there is no need to review whether this Court's decision in *Holladay* concerning accomplice witness corroboration of the underlying predicate felony should be overturned. We find that Pitts and Harris were neither accomplices as a matter of law nor accomplices as a matter of fact.

 Texas law requires that, before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime.[6] This accomplice witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.[7] An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state.[8] To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged.[9] A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed it.[10] In addition, the witness's mere presence at the scene of the crime does not render that witness an accomplice witness.[11] And complicity with an accused in the commission of another offense apart from the charged offense does not make that witness's testimony that of an accomplice witness.[12] In short, if the witness cannot be prosecuted for the offense with which the defendant is charged, or a lesser-included offense of that charge, the witness is not an accomplice witness as a matter of law.[13]

 A trial judge, therefore, has no duty to instruct the jury that a witness is an accomplice witness as a matter of law unless there exists no doubt that the witness is an accomplice.[14] For instance, the instruction is appropriate when the witness is charged with the same offense as the defendant or a lesser-included offense or when the evidence clearly shows that the witness could have been so charged.[15] If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, the trial

6. Tex.Code Crim. Proc. art. 38.14.

7. *Cathey v. State,* 992 S.W.2d 460, 462–63 (Tex.Crim.App.1999).

8. *Paredes v. State,* 129 S.W.3d 530, 536 (Tex. Crim.App.2004); *Kunkle v. State,* 771 S.W.2d 435, 439 (Tex.Crim.App.1986).

9. *Paredes,* 129 S.W.3d at 536.

10. *Kunkle,* 771 S.W.2d at 439.

11. *Id.*

12. *Id.*

13. *Id.; Paredes,* 129 S.W.3d at 536.

14. *Paredes,* 129 S.W.3d at 536.

15. *Id.*

judge should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." [16] However, as with an accomplice as a matter of law, there must still be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required. [17]

 Here, neither Pitts nor Harris was an accomplice as a matter of law or as a matter of fact. Neither witness was indicted for the capital murder or a lesser-included offense of the capital murder, and the evidence does not show that the witnesses could have been so charged. A review of the record reveals that testimony was elicited regarding the actions of Pitts and Harris before, during, and immediately after the murder as follows: (1) when Druery, Pitts, Harris, and Rome left the Contiki Club around 1:00 a.m., Druery decided to go to his father's property; (2) although Pitts drove the car, she had never been to this property before; Druery gave her directions; (3) when the group began the drive to the country, Pitts had no idea what Druery was going to do; (4) before he shot Rome, Druery told Pitts that he was going to kill Rome; (5) Druery also told Harris, "Right now I'm going to kill this nigger, this dude"; (6) Pitts reminded Druery that he was responsible for taking care of his two-year-old son, but Druery responded by stating, "So, I want his stuff"; (7) Pitts thought to herself that Druery was "just playing" when he threatened to kill Rome; (8) Harris thought that Druery was "tripping" on the embalming fluid that he had smoked; (9) Druery waited until Rome had his jacket over his head to block the wind before putting the gun about six inches from Rome's head and shooting him; (10) immediately after he killed Rome, Druery went through Rome's pockets and came back to the vehicle with Rome's cell phone, gun, marijuana, and money; (11) Pitts started crying after she witnessed the shooting; (12) Druery told Pitts, immediately after shooting Rome, that he "shouldn't have done this in front of us"; (13) immediately after he murdered Rome, Druery asked Pitts and Harris if they were all right and attempted to calm them down; (14) Harris lied to Druery and told him that he was all right; (15) Harris thought he was going to die because he believed that Druery would not want to leave any witnesses to the murder; (16) Druery asked Pitts and Harris if they wanted any money, and neither Pitts nor Harris replied; Druery gave forty dollars to each of them; (17) after the murder, Druery told Angela Minor, an acquaintance of his, "I killed somebody"; Druery explained to Minor that he and the others were out at the trailer where he used to live and they were shooting a gun; he stated that he made two people that were with him go back to the car and sit; he then relayed that while Rome had his back turned to him, he shot Rome; he said that the two people with him when he shot Rome were Pitts and Harris; (18) after the murder, Druery told Lakeisha Green, another acquaintance of his, that Rome had been trying to light a cigarette and had placed his jacket over his head to block the wind; at that time, Druery stated, he called out, "Say Rome," and Rome replied "What?" to him; Druery then shot Rome in the head; Druery also told Green that when he shot Rome, Pitts and Harris ran to the car screaming.

This evidence does not indicate that either Pitts or Harris performed any affirmative act to assist in the commission of

---

16. *Id.*

17. *Kunkle,* 771 S.W.2d at 440.

the capital murder or a lesser-included offense of the capital murder, so, it does not show that either witness was an accomplice as a matter of law or an accomplice as a matter of fact. Still, Druery points to several facts that he believes indicate that Pitts and Harris were accomplices: (1) both Pitts and Harris were present prior to and during the murder; (2) neither warned Rome that Druery had said that he intended to kill Rome; (3) there was evidence that both witnesses may have distracted Rome's attention before the shooting; (4) Harris assisted in the disposal of the body and the gun after the murder; and (5) Pitts and Harris received forty dollars each after the murder. Apart from the allegation that the witnesses may have distracted Rome, none of these acts rise to the level of an affirmative act to assist in the commission of the capital murder or a lesser-included offense of the capital murder.

The mere presence of Pitts and Harris at the scene of the crime does not render either an accomplice witness, and neither Pitts nor Harris is an accomplice witness merely because he or she knew of the planned offense but did not disclose it.[18] More importantly, the testimony itself reveals that neither Pitts nor Harris believed Druery was actually going to kill Rome. Pitts believed Druery was "just playing," and Harris thought Druery was "tripping" on embalming fluid. Additionally, nothing in the record shows that either Pitts or Harris distracted Rome to help facilitate his murder. To the contrary, the record indicates that Druery later told Angela Minor that he made Pitts and Harris "go back to the car and sit" before shooting Rome in the head.

■ As for the argument that Harris assisted in the disposal of the body and the gun after the murder, we have previously held that merely assisting after the fact in the disposal of a body does not transform a witness into an accomplice witness in a prosecution for murder.[19] The witness must still be susceptible to prosecution for the murder itself by having affirmatively assisted in committing the offense.[20] This same logic applies to assisting Druery in disposing of the gun after the murder; the fact that Harris did so does not make him an accomplice witness to the capital murder. Finally, the fact that both Pitts and Harris received forty dollars after the murder does not transform either witness into an accomplice witness. The record shows that neither requested the money nor did either respond affirmatively when asked about wanting the money. It is reasonable to infer that Druery gave Pitts and Harris the money in an attempt to calm them after the murder because they were crying and screaming.

In short, none of the evidence presented at trial indicates that either Pitts or Harris was an accomplice as a matter of law or as a matter of fact. Therefore, we will not review their testimony through the lens of the accomplice witness rule to determine if sufficient non-accomplice corroborating evidence was introduced at trial. Likewise, Druery's arguments concerning accomplice witness instructions given to or not given to the jury and concerning the application of the accomplice witness rule to the underlying predicate felony offense are inapposite. Points of error one through nine are overruled.

### Admission of Letter Into Evidence

In related points of error ten, eleven, and twelve, Druery challenges State's Ex-

18. *See id.* at 439.

19. *Paredes,* 129 S.W.3d at 536.

20. *Id.*

hibits 116A, 116B, and 116C, which were admitted into evidence by the State at punishment to rebut Druery's evidence of good character. Exhibit 116A is a letter purportedly written by Druery and Exhibit 116C is the letter's envelope; Exhibit 116B is a copy of the letter and the envelope that was made before the original Exhibits 116A and 116C were damaged in the process of extracting latent finger prints from them. The letter contains admissions by Druery concerning his violent acts and indicates a lack of remorse for Rome's murder.

In point of error eleven, Druery argues that the trial judge erred in admitting the exhibits because they were not sufficiently authenticated. In point of error ten, he alleges that the trial judge erred in admitting the exhibits because the chain of custody was broken, rendering the exhibits irrelevant. In point of error twelve, Druery claims that the trial judge erred in failing to instruct the jury that it must make a handwriting comparison to determine if the letter was written by him. We find that the exhibits were properly admitted into evidence and that the lack of an instruction to make a handwriting comparison was not error.

The letter in question was initially mailed from the Brazos County jail to Jamesia Idlebird, but was returned due to insufficient postage. The return address written on the envelope identifies Ronnie Taylor, another inmate at the jail, rather than Druery as the sender and lists the address for the jail as the sender's address. By the time the letter was returned to the jail, Idlebird had been arrested and was also incarcerated there. The returned letter was intercepted by jail staff for security reasons because it was addressed from one inmate to another. Jail staff forwarded the letter to the jail administrator, who forwarded it to the chief deputy of the sheriff's department. The chief deputy then delivered the letter to Kenny Elliott, an investigator with the sheriff's office working on Druery's case. Elliott received the letter the day after general voir dire had begun. Only Elliott testified at punishment regarding how the letter was intercepted.

The letter itself consists of five handwritten pages and five pages of attachments. The attachments are copies of the first page of the typewritten transcriptions of police interviews with LaKeisha Green, Charles Kennard, Marcus Harris, Joquisha Pitts, and Chasiti Hall. In the first handwritten page, the writer identifies himself as "Marky D," Druery's nickname, and identifies Green, Kennard, Harris, Pitts, and Hall as snitches. Each of these witnesses subsequently testified for the State at the guilt stage of the trial, and Idlebird testified as a State witness during punishment. The writer explains in the letter that he was forwarding only the first pages of the transcribed interviews because he had to study the remaining portions to prepare for trial. The writer also explains that he had to put a different name as the sender in the return address in an attempt to circumvent inspection by jail authorities.

A latent fingerprint examiner testified that eleven fingerprints on the exhibits belonged to Druery. These latent prints were located on three of the handwritten pages and one of the typewritten interview pages. The examiner also testified that four other latent fingerprints found on the letter did not match Druery's fingerprints. Druery objected to the admission of the letter on the ground that it was not properly authenticated and on the ground that the chain of custody was not properly established. He did not request an instruction for the jury to conduct a handwriting comparison, nor did he object to the trial court's failure to include an instruction re-

garding Texas Code of Criminal Procedure Article 38.27, which concerns evidence of handwriting.

## A. Authentication

■ We first address Druery's claim that State's Exhibits 116A, 116B, and 116C were not properly authenticated and should not have been admitted into evidence. As the evidentiary rules state, "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court [21] [and] [w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." [22]

■ Whether a conditional fact has been proven is a question for the jury, and the trial judge's role is limited to determining whether there is sufficient evidence to support such a finding. [23] In other words, the trial judge should admit evidence that is relevant based upon a conditional fact only if there is sufficient evidence to support a jury finding that the conditional fact is true. Indeed, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." [24] This authentication requirement can be satisfied by showing "Distinctive characteristics and the like: Appearance, contents, sub-stance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." [25] The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified. [26]

■ The issue before us, then, is whether the trial judge abused his discretion by admitting the letter and its envelope into evidence. To resolve this issue, we must determine whether it was an abuse of discretion for the trial judge to find that sufficient evidence was presented to support a jury finding that Druery wrote the letter. [27] We will affirm the trial judge's decision as long as his or her ruling is within the zone of reasonable disagreement. [28] Here, the evidence in question was properly authenticated because the letter and envelope contained sufficient distinctive internal characteristics to support a finding that Druery was the author of the letter.

First, the letter was returned to the Brazos County jail while Druery was an inmate there on or about November 4, 2003. Even though the envelope does not have a postmark and the letter itself is undated, it is reasonable to infer that it was mailed after February 7, 2003, the latest date indicated on the transcribed interview pages enclosed with the letter. Druery had remained in custody since his arrest date on November 14, 2002, and was

---

21. Tex.R. Evid. 104(a).

22. Tex.R. Evid. 104(b).

23. *Harrell v. State,* 884 S.W.2d 154, 159–61 (Tex.Crim.App.1994); *Gonzales v. State,* 929 S.W.2d 546, 550 (Tex.App.-Austin 1996, pet. ref'd).

24. Tex.R. Evid. 901(a).

25. Tex.R. Evid. 901(b)(4).

26. *Jackson v. State,* 968 S.W.2d 495, 499 (Tex. App.-Texarkana 1998, pet. ref'd).

27. *Moses v. State,* 105 S.W.3d 622, 627 (Tex. Crim.App.2003); *Angleton v. State,* 971 S.W.2d 65, 67 (Tex.Crim.App.1998).

28. *Moses,* 105 S.W.3d at 627.

in custody at the jail from the earliest possible date the letter could have been mailed until it was recovered. This evidence establishes that Druery was in a position to mail the letter from the jail.

Second, the writer of the letter identifies himself as Druery. The top of the first page of the handwritten portion of the letter states, "This is Marky D," and the letter is closed on the last handwritten page, "Marky D a/k/a lil dip." The evidence at trial showed that Druery is known as "Marky D."

Third, the letter was sent to Idlebird, Druery's cousin and a witness in his case. Fourth, the content of the letter identifies five witnesses, all of whom had given statements to the police and were going to testify for the State against Druery. The writer identifies all of these witnesses as snitches. Fifth, the letter includes the cover page of transcribed interviews with each of the witnesses the writer identifies as snitches. It is therefore reasonable to infer that Druery had access to these transcriptions. Sixth, the handwritten letter discusses facts known to Druery regarding his case, including statements that Pitts and Harris had witnessed the murder and talked with police. Seventh, the author writes that the return address had a different name than the true sender because the true sender was attempting to avoid having the letter read by jail staff. Eighth, eleven of Druery's fingerprints were positively identified as being on the letter or on the attached transcriptions.

Druery did not present any evidence of tampering or other fraud regarding the letter. So while Druery is correct that a possibility does exist that another person knew and had access to all of this information as well as blank pages containing Druery's fingerprints upon which to write the letter, it was reasonable for the trial judge to believe that a reasonable juror could find that the exhibit was what the State purported it to be—a letter written by Druery. The letter was properly authenticated, and the trial judge's decision to admit the letter was not an abuse of discretion. Point of error eleven is overruled.

### B. Chain of Custody

Next, Druery complains that the chain of custody for the exhibits was not established because Investigator Elliot did not personally seize the letter and envelope in question. He asserts that under the circumstances, there was no chain of custody connecting the writing of the letter to Druery.

A trial judge has great discretion in the admission of evidence at trial,[29] and although the evidentiary rules do not specifically address proper chain of custody, they do state that identification for admissibility purposes is satisfied if the evidence is sufficient to support a finding that the matter in question is what its proponent claims.[30] As stated above, there was sufficient evidence before the trial judge to support the finding that Druery authored the letter in question. Absent evidence of tampering or other fraud, which has not been presented here, problems in the chain of custody do not affect the admissibility of the evidence.[31] Instead, such problems affect the weight

**29.** *Montgomery v. State,* 810 S.W.2d 372, 378–79 (Tex.Crim.App.1990).

**30.** Tex.R. Evid. 901(a); *Kingsbury v. State,* 14 S.W.3d 405, 407–08 (Tex.App.-Waco 2000, no pet.).

**31.** Tex.R. Evid. 901(a); *Lagrone v. State,* 942 S.W.2d 602, 617 (Tex.Crim.App.1997).

that the fact-finder should give the evidence, which may be brought out and argued by the parties.[32] Point of error ten is overruled.

### C. Jury Instruction

■ Turning to Druery's claim that the jury should have been instructed to make a handwriting comparison, Texas law provides, "It is competent to give evidence of handwriting by comparison, made by experts or by the jury. Proof by comparison only shall not be sufficient to establish the handwriting of a witness who denies his signature under oath."[33] Druery argues that the trial judge committed error when he did not charge the jury at punishment that it could compare the handwriting of the letter in question to the handwriting of other letters known to have been written by him in determining the authenticity of the letter.[34] He reasons that without such an instruction, a reasonable juror will merely assume that the letter was written by him. Druery concedes that he did not request an instruction regarding jury comparison or object to the lack of such an instruction. He argues, however, that the lack of such an instruction caused him to suffer egregious harm.[35] We disagree.

■ In reviewing charge error, we must first determine whether error exists.[36] If we find error, we must then determine whether the error caused sufficient harm to require reversal.[37] As we have stated, the degree of harm necessary for reversal depends upon whether the error was preserved.[38] Error properly preserved by an objection to the charge will require reversal as long as the error is not harmless.[39] We have interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal.[40] But when the charging error is not preserved, a greater degree of harm is required, and this standard of harm is described as egregious harm.[41] Errors that result in egregious harm are those affecting the " 'very basis of the case,' " those depriving "the defendant of a 'valuable right,' " or those that " 'vitally affect a defensive theory.' "[42]

Druery fails to demonstrate that there was any error at all in the omission of a charge concerning handwriting comparison. He never denied that he was the author of the letter, and we cannot say that the decision to not request such an instruction or to not object to the lack of such an instruction was not a matter of trial strategy. But even if we were to assume error in failing to instruct the jury to make a handwriting comparison, such error was not egregious. Druery does not explain how the omission of the instruction at issue harmed him other than to argue that this case was very close as to whether a life or death sentence was appropriate. But as the State points out, other instructions in the punishment charge served to

---

32. Tex.R. Evid. 901(a).

33. Tex.Code Crim. Proc. art. 38.27.

34. *See* Tex.Code Crim. Proc. art. 38.27.

35. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985).

36. *Id.* at 171; *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App.1996).

37. *Hutch,* 922 S.W.2d at 171–72 (quoting *Almanza,* 686 S.W.2d at 172).

38. *Id.* at 171.

39. *Id.*

40. *Id.*

41. *Id.*

42. *Id.*

instruct the jury as to its duty as fact-finder.

 The jury was instructed, "You are the exclusive judges of facts proved, of the credibility of the witnesses, and the weight to be given their testimony[.]" The jury was additionally told, "You cannot consider any evidence of unadjudicated extraneous crimes or bad acts other than the one charged in the indictment in this case for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such acts, if any." These instructions served to guide the jury in its evaluation of the letter with regard to the chain of custody, the fingerprint evidence, and the contents of the letter itself. As we have stated, when a refused charge is adequately covered by the charge given, no harm is shown.[43] Because Druery fails to demonstrate that the omission of the instruction was erroneous or that the omission, even if erroneous, constituted egregious harm, point of error twelve is overruled.

### Instruction on Offense of Abuse of Corpse

 In point of error thirteen, Druery complains that the trial judge erred when he refused Druery's request to charge the jury on the offense of abuse of corpse. Druery concedes that abuse of corpse, while a less serious offense than capital murder, is not a lesser-included offense of capital murder.[44] He was therefore not entitled to the instruction. Point of error thirteen is overruled.

### Instruction on Lesser–Included Offense of First–Degree Murder

 In his fourteenth point of error, Druery complains that the trial court should have instructed the jury at guilt, *sua sponte*, on the lesser-included offense of first-degree murder. He argues that the failure to include the instruction amounted to fundamental error even though Druery, through counsel, unequivocally informed the trial court that the lesser-included instruction was not desired. We find that Druery is estopped from bringing this claim.

 Texas law mandates that a trial court submit a charge to the jury setting forth "the law applicable to the case,"[45] and as this Court has stated, "[An appellant] must object to the charge before he may be heard to complain on appeal about 'errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts.'"[46] On the other hand, this Court has stated that if no proper objection was made at trial to the jury charge, an appellant must claim that the alleged error was fundamental.[47] An appellant will obtain a reversal only if the error was so egregious and created such harm that the he or she "has not had a fair and impartial trial—in short 'egregious harm.'"[48] We have noted, however, that "[i]f a party affirmatively seeks action by the trial court, that party cannot later

43. *Davis v. State,* 651 S.W.2d 787, 792 (Tex. Crim.App.1983).

44. *See Rousseau v. State,* 855 S.W.2d 666, 672 (Tex.Crim.App.1993); TEX.CODE CRIM. PROC. art. 37.09.

45. TEX.CODE CRIM. PROC. art. 36.14.

46. *Posey v. State,* 966 S.W.2d 57, 61 (Tex. Crim.App.1998) (quoting TEX.CODE CRIM. PROC. art. 36.14); *see also* TEX.CODE CRIM. PROC. art. 36.19.

47. *Almanza,* 686 S.W.2d at 171.

48. *Id.*

contend that the action was error."[49] Indeed, "the law of invited error estops a party from making an appellate error of an action it induced."[50]

Here, the record reveals that Druery, through counsel, affirmatively advised the trial judge that he did not desire a charge on the lesser-included offense of first-degree murder. At the charge conference, the following exchange took place:

THE COURT: Has the State had an adequate opportunity to review the proposed charge?

[STATE]: We have, Your Honor.

THE COURT: And are there any objections?

[STATE]: No, Your Honor.

THE COURT: I want to be sure the State is not requesting a lesser-included offense of murder.

[STATE]: That's correct.

THE COURT: Very well. [Defense counsel], do you have any objections?

[DEFENSE]: Yes, Your Honor, I have [three] that I will memorialize Monday morning. I'm—oh, I'm sorry. I have no objections to the Court's charge as presented to us at—at 12:40 today.

* * *

THE COURT: All right. Court will overrule those three objections [which concern an instruction on the use of illegally obtained evidence, an instruction on the lesser-included offense of abuse of corpse, and an instruction on accomplice as a matter of law rather than of fact] with the understanding that I expect you to memorialize those in writing on Monday before we begin. Are there any other objections?

[DEFENSE]: Not on behalf of Mr. Druery, Your Honor.

THE COURT: Be sure y'all are not asking for a lesser-included offense of murder.

[DEFENSE]: We are not, Your Honor.

In light of the above exchange, it is evident that Druery not only did not object to the omission of the lesser-included instruction on first-degree murder but that he affirmatively requested, after inquiry by the trial judge, that the lesser-included instruction not be given. Druery induced the alleged error of which he now complains. He may not now argue on appeal that the trial judge had a duty to *sua sponte* give the jury an instruction on the lesser-included offense of first-degree murder in the face of his specific request that the charge not be included. Because Druery is estopped from bringing this charge-error claim on appeal, we do not address whether the omission of and failure to *sua sponte* give the lesser-included instruction was erroneous or amounted to egregious harm.[51] Point of error fourteen is overruled.

### Future Dangerousness

 Druery claims in his twenty-first point of error that the evidence presented at trial was legally insufficient to support the jury's finding that he would be a continuing threat to society.[52] The State has the burden of proving the punishment issue of future dangerousness beyond a reasonable doubt.[53] In other words, the

49. *Prystash v. State,* 3 S.W.3d 522, 531 (Tex. Crim.App.1999).

50. *Id.*

51. *Almanza,* 686 S.W.2d at 171–72.

52. *See* Tex.Code Crim. Proc. art. 37.071 § 2(b)(1).

53. Tex.Code Crim. Proc. art. 37.071 §§ 2(b)(1), 2(c); *Ladd v. State,* 3 S.W.3d 547, 557–58 (Tex.Crim.App.1999).

State has the burden of proving beyond a reasonable doubt that there is a probability that Druery would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison.[54] In its determination of the issue, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial.[55]

 Indeed, when determining whether a defendant will pose a continuing threat to society, a jury may consider a variety of factors.[56] As we have said, these factors include, but are not limited to, the circumstances of the capital offense, including: the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of the defendant's acts; the forethought and deliberateness exhibited by the crime's execution; the existence and severity of prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; psychiatric evidence; and character evidence.[57] But the circumstances of the offense itself "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue."[58] As an appellate court reviewing the jury's finding, we must view all of the evidence before the jury in the light most favorable to its finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that

the answer to the first punishment issue was "yes."[59]

The evidence presented at trial shows that Druery picked Rome up in Waco and drove him to Bryan. He attempted on several occasions to obtain Rome's gun while at a club and on the drive out to the Druery property. At the property, Druery was able to get the gun while he, Pitts, Harris, and Rome shot the gun into a stock tank. During this time, Druery informed both Pitts and Harris that he was going to kill Rome. Pitts reminded Druery that Druery was responsible for taking care of his two-year-old son, but Druery's response was "So, I want his stuff."

After ordering Pitts and Harris back to the vehicle, Druery approached Rome in a manner by which he could not be seen, held the gun within six inches of Rome's head, and shot him once in the head, followed by two additional shots to his neck and body. Druery then took a cell phone, some marijuana, and some cash from Rome's body. He also kept the gun. Druery attempted to destroy evidence of the crime by twice burning the body and by dumping it into the stock tank. Additionally, directly after the murder, rather than demonstrating remorse for the crime itself, Druery showed regret only for killing Rome in front of Pitts and Harris, giving each forty dollars to calm them. He also concocted a cover story to explain why Rome would be missing and instructed Pitts and Harris to give the story if questioned.

54. TEX.CODE CRIM. PROC. art. 37.071 §§ 2(b)(1), 2(c).

55. *Id.*

56. *Wardrip v. State,* 56 S.W.3d 588, 594 (Tex. Crim.App.2001); *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App.1987).

57. *Wardrip,* 56 S.W.3d at 594.

58. *Id.; Muniz v. State,* 573 S.W.2d 792, 795 (Tex.Crim.App.1978).

59. *Ladd,* 3 S.W.3d at 558.

This evidence shows that Druery killed Rome with calculation, forethought, and deliberateness to obtain a minimal amount of personal property. Moreover, he committed the murder even after Pitts had tried to dissuade him by reminding Druery of his obligation to care for his own young son.

Evidence apart from the circumstances of the crime itself was also presented to the jury. The State introduced evidence of his: five prior marijuana possession charges; physically violent behavior toward a former girlfriend, which caused her severe injury; pointing a gun at another person in an aggressive manner when confronted about a coat; physically assaultive behavior toward a roommate; overly hostile and violent reactions in situations that angered or frustrated him; threats while displaying a knife to commit physical violence upon pawn shop employees who would not refund money for some merchandise; throwing a chair and table toward two people and swinging a mop at one of them, hitting her, in response to an allegation that he had a puppy he was calling "Cocaine"—that did not belong to him; beating on a door, yelling that he wanted his CD's and that he was going to kill someone; shooting a pistol while at a club on one occasion and a shotgun on another occasion; head-butting Pitts, hitting and kicking her, choking her, and threatening to kill her while she was his girlfriend; heavy drug use and his constant possession of weapons; breaking into an apartment where a gun was later found to be missing; chasing Pitts with a rifle when she refused to make him something to eat; threats to kill several people; threatening his father, grandfather, and grandmother with a hammer; attempts to

kick down a door of a house because he wanted to use the phone; destroying property while an inmate at the county jail and making threats while at the jail that he was going to hurt someone; and in a letter sent from the jail containing his DNA where he wrote, "Shit if I saw him again before I came in here I would have 2 murder cases. Fuck em all cause Im ball when I get out."

A rational jury could determine from all of this evidence that there was a probability beyond a reasonable doubt that Druery would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison. Point of error twenty-one is overruled.

### Constitutionality of Article 37.071 of the Texas Code of Criminal Procedure

In his fifteenth point of error, Druery contends that the omission of a burden of proof in the mitigation special issue,[60] which instructs the jury to consider all evidence in determining whether sufficient mitigating circumstances warrant a life sentence instead of a death sentence, is unconstitutional. He argues that the burden should rest with the State to prove lack of mitigation beyond a reasonable doubt but that the burden was effectively and wrongfully placed on him to convince the jury to forgo a death sentence for that of life.

Druery candidly concedes that this claim has been rejected by us but asks that we revisit the issue.[61] Druery has not distinguished his case, and we decline Druery's invitation to revisit the issue. Point of error fifteen is overruled.

---

60. Tex.Code Crim. Proc. art. 37.071 § 2(e)(1).

61. *See Howard v. State,* 941 S.W.2d 102, 119 (Tex.Crim.App.1996) (citations omitted); *see*

*also Blue v. State,* 125 S.W.3d 491, 501 (Tex. Crim.App.2003).

In his sixteenth point of error, Druery complains that the rule prohibiting the trial judge, the State, the defendant, or defense counsel from informing the jury that a failure of the jury to agree on a special issue would result in a life rather than a death sentence being imposed is unconstitutional.[62] Druery recognizes that we have repeatedly rejected this claim [63] but asks that we reconsider it. He has not distinguished his case from those in which this same claim was denied, however, and we decline to revisit the issue. Point of error sixteen is overruled.

In his seventeenth, eighteenth, and nineteenth points of error, Druery asserts that the trial judge's failure to define the words "probability," "continuing threat to society," and "criminal acts of violence" to the jury with regard to the future-dangerousness special issue is unconstitutional.[64] Druery acknowledges that we have previously rejected these claims [65] but asks that we reconsider them.

■ As we have previously stated, "This Court has repeatedly held that the terms ... 'probability,' 'criminal acts of violence' and 'continuing threat to society,' ... require no special definitions." [66] "Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and un-

der such circumstances such common words are not necessarily to be defined in the charge to the jury." [67] In addition, the Supreme Court of the United States has concluded that the submission of this special issue, even without the definitions in question, is sufficient to constitutionally guide the jury's determination.[68] We decline to reconsider our previous holdings, especially when it has not been shown that Druery's case is distinguished from those cases in which these same claims were rejected. Points of error seventeen, eighteen, and nineteen are overruled.

Similarly, Druery contends in his twentieth point of error that the trial court's failure to define the jury-instruction term "moral blameworthiness" with regard to the mitigation special issue, which asked whether there was sufficient mitigating circumstance or circumstances to warrant a sentence of life rather than death,[69] is unconstitutional. The jury was instructed at punishment that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." [70] The question of whether the failure to define the term "moral blameworthiness" has already been decided adversely to Druery for the same reasons discussed above,[71] and he does not distinguish his case from those previously

---

**62.** Tex.Code Crim. Proc. art. 37.071 §§ 2(a)(1), (g).

**63.** *Davis v. State,* 782 S.W.2d 211, 222 (Tex. Crim.App.1989).

**64.** *See* Tex.Code Crim. Proc. art. 37.071 § 2(b)(1).

**65.** *King v. State,* 553 S.W.2d 105, 107 (Tex. Crim.App.1977).

**66.** *Earhart v. State,* 877 S.W.2d 759, 767 (Tex. Crim.App.1994).

**67.** *King,* 553 S.W.2d at 107.

**68.** *Jurek v. Texas,* 428 U.S. 262, 275, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

**69.** Tex.Code Crim. Proc. art. 37.071 § 2(e)(1).

**70.** Tex.Code Crim. Proc. art. 37.071 § 2(f)(4).

**71.** *Blue,* 125 S.W.3d at 505 (citing *Wright v. State,* 28 S.W.3d 526, 537 (Tex.Crim.App. 2000); *Ladd,* 3 S.W.3d at 572–73; *Raby v. State,* 970 S.W.2d 1, 8 (Tex.Crim.App.1998); *Cockrell v. State,* 933 S.W.2d 73, 93 (Tex. Crim.App.1996)).

decided. We decline to revisit the issue. Point of error twenty is overruled.

We affirm the judgment of the trial court.

JOHNSON, J., concurred in point of error fourteen and otherwise joined the opinion of the Court.

KELLER, P.J., filed a concurring opinion.

KELLER, P.J., concurring.

### 1. Accomplice testimony

Appellant raises various claims based on the notion that Pitts and Harris were accomplices. The trial judge instructed the jurors to determine whether Pitts and Harris were accomplices as a matter of fact but refused to submit an instruction describing these witnesses as accomplices as a matter of law. In points of error one through three, appellant claims that the evidence was insufficient to show that the testimony of these alleged accomplices was corroborated. In points of error four and five, he claims that the trial judge erred in refusing to instruct the jury that Pitts and Harris were accomplices as a matter of law. In points of error six and seven, he contends that the accomplice witness instructions that were submitted were defective. And in points of error eight and nine, he contends that the instructions submitted constituted comments on the weight of the evidence.

The Court's holding with regard to these points seems to be that the evidence was insufficient to support a finding that Pitts and Harris were accomplices as a matter of fact because they were not linked to the crime by any direct testimony or physical evidence. But testimony indirectly linking a person to a crime may be sufficient if enough "linking" factors are present. In *Medina v. State*, we held that the following factors indirectly linking one of the witnesses to the crime were sufficient to support a finding that he was an accomplice as a matter of fact: (1) the witness's presence at the scene when the crime occurred, (2) the gang-motivated nature of the crime, (3) the witness's membership in the gang, and (4) the witness's efforts to cover up the crime.[1] We acknowledged that the issue was "close" and found that the evidence was not sufficient to raise accomplice status as to two other individuals because one of these four factors was missing for each of them.[2]

While gang membership and motivation were not at issue in this case, there were other factors linking Pitts and Harris to the crime as accomplices. Both Pitts and Harris were connected to the crime in the following ways: (1) they were present at the scene when the crime occurred, (2) they were informed of appellant's intent to commit the crime before the crime occurred, (3) they were each given some of the proceeds of the crime (money stolen from the victim), and (4) they were present with appellant during appellant's efforts to cover up the crime. With respect to Harris, there was also evidence that he actually assisted appellant's efforts to cover up the crime by (1) helping appellant obtain the gasoline used to set the victim's body on fire and (2) helping appellant dispose of the murder weapon. Pitts and Harris offered exculpatory explanations for some of these factors. There was testimony that they did not believe appellant when he told them that he was going to murder Druery,[3] that the money was given to them

---

1. 7 S.W.3d 633, 642 (Tex.Crim.App.1999).

2. *Id.*

3. Pitts's claim that she reminded appellant of his two-year-old son could viewed as an attempt to discourage the commission of the offense.

just to calm them down, and that they stayed with appellant during his efforts to cover up the crime because they were afraid of him. But the jury did not have to believe these exculpatory explanations. The only exculpatory fact the jury had to believe was that Pitts went to the police on her own and revealed what appellant had done. I think that, at the least, the evidence was sufficient to submit Harris's accomplice status to the jury. But for several reasons, we need not—and I believe should not—address whether the evidence raised the issue of whether Pitts and Harris were accomplices as a matter of fact.

First, as the Court concludes, it is absolutely clear that appellant was *not* entitled to an accomplice "as a matter of *law*" instruction. While there was evidence from which a jury could rationally determine that Harris (and possibly Pitts) was an accomplice, there also existed plenty of evidence from which the jury could conclude that Harris and Pitts were not accomplices. That alone defeats appellant's sufficiency of the evidence claim, advanced in points of error one through three. If accomplice status was, at best, a fact question for the jury, then the jury was free to decide that the witnesses were not accomplices, and thus, their testimony did not have to be corroborated.

In any event, their testimony *was* corroborated. Appellant does not challenge the sufficiency of the evidence to show the murder, and indeed, such a challenge would be laughable. He confessed to the murder to four friends and acquaintances: Chasiti Hall, Angela Minor, LaKeisha Green, and Charles Kennard. The victim's body was recovered on Druery property from a stock tank. But corroborating evidence was also present for the underlying offense of robbery (obviating any need to discuss appellant's contention that we should reconsider cases holding that the underlying offense need not be corroborated). Non-accomplice evidence showed appellant to be in possession, after the murder, of two items of the victim's property: a gun (the murder weapon) and a cell phone. Charlinda Thomas and Laquita McGowan testified they knew the victim carried a gun, and Ebony Williams testified that she helped the victim purchase a gun. Appellant displayed the murder weapon to both Hall and Kennard after the murder, and he told Minor that he committed the murder with the victim's gun. Kennard also saw appellant with the victim's cell phone.

The fact that Pitts and Harris were not accomplices as a matter of law also defeats appellant's fourth and fifth points because it means that the trial court did not err in refusing to submit an accomplice "as a matter of law" instruction. Although appellant claims in points six through nine that the instructions given were improper and commented on the weight of the evidence, to a large extent those claims turn upon the legitimacy of submitting *any* accomplice "as a matter of fact" instruction. One of appellant's major claims under points six and seven is that all accomplice "as a matter of fact" instructions are inadequate because juries can only understand and apply accomplice "as a matter of law" instructions and appellate review can be adequate only when the jury is called upon merely to determine whether accomplice testimony is corroborated. His "comment on the weight of the evidence" claim advanced in points eight and nine amounts to a claim that "as a matter of fact" instructions always constitute comments on the weight of the evidence because, in his view, the accomplice witness statute authorizes only "as a matter of law" instructions.

These claims are an attempt to force a square peg into a round hole by insisting

that the jury must be charged on Pitts and Harris as accomplices as a matter of law when the evidence does not in fact establish their accomplice status as a matter of law. With regard to the specifics of the contention made in points of error six and seven, I observe that an inquiry into accomplice status is essentially the same as an inquiry into determining whether a defendant is guilty under the law of parties. The latter inquiry is trusted to jurors all the time. Appellant argues that he is denied appellate review because no special issue regarding accomplice "as a matter of law" versus "as a matter of fact" was submitted. But most issues in a criminal case—including, for example, the law of parties—are not submitted separately. We have long held that a general verdict is proper.[4] As for appellant's contention regarding a comment on the weight of the evidence, I see nothing in the relevant statutes that limits accomplice witness instructions to the accomplice "as a matter of law" variety.[5] And it is not a comment on the weight of the evidence to charge the jury with determining whether the witnesses are accomplices as a matter of fact when the evidence at trial raises a fact issue on that score.

Points of error six and seven also allege specific errors (of omission) in the instructions given: (1) the trial judge did not instruct the jury that, if they found the witnesses to be accomplices, their testimony must be excluded before examining the remainder of the evidence for corroboration, (2) the trial judge did not instruct the jury that one accomplice cannot corroborate another accomplice, (3) the jury was not required to find corroboration on all of the elements of the offense (e.g. the underlying offense), and (4) the "mere presence" part of the accomplice witness instruction was defective because it did not clearly provide that *appellant's* mere presence was not sufficient to connect him to the offense. Appellant concedes that he did not object on these grounds; therefore, he must show egregious harm.[6] Given that the accomplice witness instruction in this case tracked the language of the statute and included some supplemental language beneficial to appellant, and that there was significant non-accomplice evidence as to both the murder and the robbery, I conclude that appellant did not suffer egregious harm from the claimed omissions.

## 2. Lesser-included offense instruction

In point of error fourteen, appellant contends that the trial court erred in failing to submit an instruction on the lesser-included offense of murder. In rejecting this claim, the Court holds that appellant is estopped by his own affirmative conduct, but I would reject appellant's claim on a narrower basis. While defense counsel did expressly agree with the trial court that he was not requesting a lesser-included offense, I would say that he waived the claim rather than that he is estopped from advancing the claim. I would not say, as the Court does, that his agreement with the trial court's statement amounts to having induced the error of which he complains or that it amounts to a specific request that the instruction not be submitted. It is enough to say that a lesser-included of-

4. *Isaacs v. State*, 36 Tex.Crim. 505, 528, 38 S.W. 40, 40 (1896)(verdict can be general as to whether a defendant is a principal or an accomplice); *Bailey v. State*, 532 S.W.2d 316, 322–323 (Tex.Crim.App.1975)(different manner and means of committing murder); *Herrin v. State*, 125 S.W.3d 436, 441

(Tex.Crim.App.2002)(underlying offenses in a capital murder case).

5. *See* TEX.CODE CRIM. PROC., Arts. 38.14, 38.17.

6. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1985).

fense instruction is a kind of defensive issue [7] that does not become law applicable to the case if appellant fails to request it.[8]

With these comments, I concur in the Court's judgment with respect to points of error one through nine and point of error fourteen, and I otherwise join the Court's opinion.

---

7. *See Bufkin v. State,* 207 S.W.3d 779, 782 (Tex.Crim.App.2006).

8. *Posey v. State,* 966 S.W.2d 57, 61–64 (Tex. Crim.App.1998).