In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00354-CR
_____

**MARK HENRY LEE JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 5**
**Montgomery County, Texas**
**Trial Cause No. 11-268917**

**MEMORANDUM OPINION**

After he was convicted in a jury trial on a charge of driving while intoxicated, Mark Henry Lee Jr. appealed, arguing the State failed to establish a proper chain of custody to support the trial court's decision to admit the results of his blood test into evidence. In his appeal, Lee argues that the State failed to establish a proper chain of custody showing that the specimen tested by the

hospital was his; additionally, he contends the State failed to prove who drew the specimen. We affirm.

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *See Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007). To establish the facts necessary to support the trial court's decision to admit the results of a blood test into evidence, "a proper chain of custody of the blood sample that was drawn from the accused and later tested must be established." *Durrett v. State*, 36 S.W.3d 205, 208 (Tex. App.—Houston [14th Dist.] 2001, no pet.). In the absence of any evidence of tampering or alteration, "[p]roof of the beginning and end of a chain of custody will support the admission of the evidence[.]" *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd); *see also Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989); *Durrett*, 36 S.W.3d at 208. Generally, in such cases, gaps or theoretical breaches that may exist in the chain of custody go to the weight of the evidence rather than to its admissibility. *Durrett*, 36 S.W.3d at 208; *see also Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997). Where the evidence before the jury allowed the jury to reasonably find that the test at issue was performed on blood drawn from the accused, the evidentiary requirements needed to authenticate

the test being offered into evidence are satisfied. *See* Tex. R. Evid. 901(a); *Dossett*, 216 S.W.3d at 17.

Lee contends the trial court erred by admitting a toxicology report dated May 10, 2011. The report concerns a test that was performed by the lab at Conroe Regional Medical Center as part of the medical workup done on Lee after he arrived in the emergency room. The toxicology report indicates the lab performed a number of tests on a specimen that it received at "2200[,]" or 10:00 p.m. The report at issue contains Lee's name, so the hospital apparently associated the test at issue with a test done on Lee's specimen. The test result in the report at issue indicates that Lee's blood alcohol level was 0.194, and one of the hospital's lab technologists testified the result indicated that Lee had alcohol in his bloodstream at a level more than double the legal limit.[1]

Lee contends the evidence before the jury was not sufficient to establish that the specimen tested in the report was a specimen that was drawn from his body. According to Lee, the State also failed to sufficiently establish who drew the specimen that the lab received at 10:00 p.m. However, we disagree the evidence did not allow the jury to reasonably determine who drew the specimen. In our

---

[1]*See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011) (providing *per se* definition of being intoxicated when "having an alcohol concentration of 0.08 or more").

opinion, the testimony at Lee's trial tends to show that a paramedic who accompanied Lee in the ambulance took the specimen later tested in the lab.

Lee argues that the testimony of the emergency room nurse and the testimony of the paramedic failed to establish who drew the blood specimen associated with the report the trial court admitted into evidence. Kelly Isham, the paramedic who accompanied Lee in the ambulance, could not specifically recall drawing Lee's blood, but he did recall that he put in Lee's IV. When asked on cross-examination if he administered an IV at the scene in the ambulance, Isham responded: "Immediately before the transport or possibly during transport. I don't know exactly when I did it." However, Isham testified that he did not note in Lee's records whether he drew Lee's blood, but he explained that making a note of that fact would "not [be] something I would normally do." Isham also testified that it is "common practice to draw blood" when transporting a patient to the hospital. According to Isham, upon arriving with a patient at the emergency room, it was his custom to give any vials used in drawing a patient's blood to the triage nurse or to the charge nurse. Isham indicated that he followed the same procedure in drawing a patient's blood "every time[,]" and he stated he would have followed this procedure in drawing Lee's blood.

4

Given the testimony relevant to the specimen at issue, reasonable jurors could conclude that Isham began intravenous therapy before arriving at the hospital, and that based on Isham's custom and practice, he obtained the specimen at issue immediately before he started Lee's IV. In this circumstance, the testimony about his customary practices allowed the jury to conclude Isham drew Lee's blood that night. Consequently, the trial court did not err by admitting the report, as Isham's testimony supports the jury's conclusion that the specimen identified in the report was the specimen that Isham drew before Lee arrived at the hospital.

Michelle Strommer, the supervising nurse on duty in the emergency room on the night of May 10, 2011, also testified during the trial. Her testimony indicates that she recalled drawing Lee's blood around 11:00 p.m.; therefore, the jury could not reasonably conclude from Strommer's testimony that the specimen she drew at 11:00 was the one the lab received approximately one hour earlier, as the records the State proffered show that the lab only received one specimen of blood to test at 10:00 p.m.

Strommer's testimony, however, tends to show that the blood the lab received at 10:00 p.m. probably arrived with Lee in the ambulance. According to Strommer, if the ambulance personnel start an IV while transporting a patient to the emergency room, ninety percent of the time the ambulance personnel also draw

blood. Strommer explained that in such cases, the emergency medical technician on the ambulance crew gives the vial to a nurse, who then places the hospital's label on the vial of blood. The label contains the patient's information.[2] Then, the nurse places the vial in a specimen bag, which is sent to the lab for testing. Strommer also explained that if a patient did not have his blood drawn while being transported in an ambulance, a nurse or a paramedic working in the emergency room would then draw the patient's blood specimen into labeled vials, place them in a specimen bag, and then send the bag by pneumatic tube to the lab. Strommer added that if information is missing from the label, "the lab throws the vials away and we have to redraw the [blood]."

The record includes testimony from the medical lab technologist, Lanelle Abke, who performed the testing on the blood that arrived in the lab at 10:00 p.m. According to Abke, the blood was in a vial labeled with a bar code system that tied the specimen to Lee. When Abke was asked if she got the specimen from Strommer, Abke explained that she did not know for sure who drew Lee's blood, but that "[n]ormally, we would get the blood from the EMTs."

---

[2]According to Strommer, the labels on the vials contain information about the patient, such as the patient's account number, medial record number, birthdate, admission date, and the name of the patient's assigned physician.

Lee argues the State failed to sufficiently establish the origin of the blood that arrived in the lab at 10:00 p.m. Nevertheless, the record includes testimony showing what the customary medical practices were in obtaining a blood specimen from a patient transported to Conroe Regional by ambulance, and the reasonable inferences available from the testimony admitted at Lee's trial allowed the jury to conclude that the hospital's and the ambulance's customary practices were probably followed. Therefore, there was evidence before the jury that allowed it to conclude that Isham drew the blood that arrived in the lab at 10:00 p.m., and that Lee gave the blood that was tested by the lab. Consequently, the trial court properly admitted the evidence to allow the jury to decide whether Isham performed the blood draw that was received in the lab at 10:00 p.m. *See Durrett*, 36 S.W.3d at 211 (noting "[t]hat a witness could not recall taking appellant's blood sample or gave contradictory testimony regarding whether or not he remembered performing the blood alcohol analysis on appellant's blood sample goes to the weight, not the admissibility, of the evidence").

We conclude that the testimony before the jury about the procedures followed by Isham and by the hospital established sufficient evidence to allow the jury to conclude that Isham collected a blood specimen from Lee, and to conclude that the specimen was the specimen associated with the report admitted into

evidence during the trial. *See Beck v. State*, 651 S.W.2d 827, 829 (Tex. App.—Houston [1st Dist.] 1983, no pet.) (holding that evidence was admissible where the witness could not remember who drew the patient's blood, but explained that the draw was standard hospital procedure). We also note that Lee has not argued that the specimen was altered or tampered with before it was tested. We hold the trial court did not abuse its discretion by admitting the medical record at issue. We overrule Lee's sole issue.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on October 15, 2014
Opinion Delivered March 4, 2015
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

8