

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00220-CR

**OLANDO KENNEDY,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 13th District Court
Navarro County, Texas
Trial Court No. 32900-CR**

## MEMORANDUM OPINION

A grand jury charged Olando Kennedy with two counts of aggravated robbery (of Jeremiah Blair and Michael Solomon, respectively) with a deadly weapon. The robbery occurred at an apartment complex near Navarro College in Corsicana, and Blair was shot multiple times. In a jury trial, Kennedy was found guilty and assessed sentences of forty and fifteen years, to be served concurrently, and a $10,000 fine on each count. The trial court entered a judgment on each count. Kennedy appeals, raising four issues. We will affirm.

**The Evidence**

*Jeremiah Blair*:  Blair testified that on the evening of October 20, 2009, he and his friend Michael Solomon went to Atavia Armstrong's apartment in Blair's van after Armstrong had called him numerous times asking him to come over and hang out at her apartment, which was in the West Park Row apartment complex and was an upstairs unit.  Also there was Darrick Bailey, who had a gun.  Armstrong's roommate Antia Jones was there as well but was asleep in a bedroom.  Bailey left soon after Blair and Solomon's arrival.  Blair and Solomon were smoking marijuana and drinking.  Two black men wearing ski masks entered the apartment; at least one of them had a gun, and they demanded Blair's keys.  Blair's next memory of events was waking up in the hospital with multiple gunshot wounds and being paralyzed from the chest down.

*Michael Solomon*:  Solomon testified, like Blair, that they went to Armstrong's apartment in Blair's van around 5:00 or 6:00 p.m.  Solomon said that four other black men were there, one of whom was Bailey.  One of the other three was wearing a grill, and those three left when Blair and Solomon arrived, while Bailey went back to a bedroom with a gun that had been out on the table.  Bailey then left about five minutes later. Solomon said that he was smoking marijuana and watching television with Blair and Armstrong.  About twenty minutes later, Bailey returned to the apartment and went into a bedroom.  Two or three minutes later, three black men wearing ski masks entered the apartment, and each of them had a gun.  One of the gunmen was the man who had been there earlier and had the grill, according to Solomon.  When the gunmen entered, Armstrong went into a bedroom.

While pointing guns at Blair and Solomon, the gunmen demanded their money. Solomon said that he gave them $200 and that Blair gave them $400. The gunman with the grill demanded Blair's keys and told the other two gunmen to go outside. Blair's keys were on the floor, and when Blair went for them, Solomon heard two shots. The man with the grill shot Blair twice, and he fled the apartment. Blair went after the shooter down the stairs, and Solomon heard eight more shots. While the robbery and shooting were going on, Armstrong and Bailey never came out of the bedroom.

Solomon identified Olando Kennedy in the courtroom and said that he knew Kennedy from high school football in Terrell. Solomon testified that Kennedy was one of the three gunmen in the robbery, but Kennedy was not the one with the grill who had shot Blair. Solomon said that although Kennedy was wearing a mask, he was able to identify Kennedy because he remembered Kennedy's body shape from high school football.

*Cameron Morris*: Morris testified that he went to Navarro College and that he knew Bailey, Kennedy, and Sherrod Bell; Bailey went to college with Morris. At the end of the day after school, Morris said that he gave Bailey a ride to the nearby Park Row apartments, where students would hang out after school. On the ride over, Bailey, who was busy texting on his phone, told Morris that he was going to "get a lick" on a van at the apartments. When they parked at the apartments, Kennedy and Bell got in Morris's backseat and they began talking about how they were going to get in Blair's van, including busting out a van window with the butt of a gun. They talked and made gestures as if they had guns, but Morris did not see a gun on the three men.

Morris told Bailey, Kennedy, and Bell that he would go up to his friend Lewisha's apartment and ask for a screwdriver for them, but Lewisha was not there and he did not ask for a screwdriver from the person who had answered the door. He returned to his car and told Bailey, Kennedy, and Bell that they did not have a screwdriver and suggested that they get out of his car. Morris then went into the apartment of his friend Darryl Welch, who lived directly below Armstrong's apartment, and Morris and Welch began to get ready to play a video game. Bailey followed Morris briefly into Welch's apartment but then went up to Armstrong's apartment.

Just after hearing Bailey go up the stairs, he heard a bunch of footsteps and a door being pushed in. He next heard a lot of commotion upstairs, including a girl screaming, a man's voice telling everyone to get on the floor, and then several gunshots. After the commotion stopped, Welch cracked open his front door, looked out, and told Morris they should leave through the back door. When they left, Welch told Morris that Blair had been hit. Morris said he saw a lot of people running everywhere, but he could not see their faces. Morris denied knowing about, planning, or being involved in the robbery in which Blair was shot.

*Darrick Bailey*: Bailey first testified that he had been charged with aggravated robbery and was being offered a plea deal of five years' deferred adjudication in exchange for his truthful testimony. He said that he was staying at Armstrong's apartment at the time of the offense and was going to Navarro College. He knew Bell, a tattoo artist, and he had met Kennedy through Bell; Kennedy and Bell were roommates. About a month before the offense, he had gotten into a fight with Blair over a girl.

On the day of the offense, Bailey went to Kennedy and Bell's apartment to borrow a gun for protection because Armstrong's cousin's father was coming to get her cousin and the cousin's father was known to carry a gun. All three of them went to Wal-Mart where Kennedy bought bullets. They returned to the apartment; Kennedy and Bell each had guns. Bailey went to Armstrong's apartment with the borrowed gun and was sleeping on the couch when Blair and Solomon arrived. Armstrong woke Bailey and told him to go sleep in the bedroom. Bailey went to the bedroom with the gun, put on his shoes and shirt, and then left Armstrong's apartment for the college. As Bailey was leaving, Armstrong stepped outside and told him that Blair had some "bricks" (cocaine bricks) in his van and to call Kennedy and Bell and tell them. Bailey thought that Kennedy and Bell would steal the bricks from Blair's van. Bailey then put the borrowed gun in Bell's cousin's car at the college, and Bailey asked Morris for a ride back to Armstrong's apartment.

During the ride to the apartment, Bailey told Morris that Kennedy and Bell "were about to hit a lick," which Bailey thought meant they were going to steal the cocaine bricks from Blair's van. When they parked at the apartment, Kennedy and Bell got in the back seat of Morris's car; they had arrived in the car that Bailey had put Bell's gun in. Bell and Kennedy both had masks; Bell had a camouflage hunting mask, and Kennedy had a clear mask with a string on the back, similar to a Halloween mask. Bailey and Morris got out of the car, and they stopped by Welch's apartment; Welch was holding a black ski mask. Morris went in Welch's apartment, and Bailey went upstairs to Armstrong's apartment, while Kennedy and Bell stayed in Morris's car.

Bailey went into Armstrong's apartment and found Armstrong and Blair talking to each other. Armstrong gave him a look that Bailey interpreted to mean that she wanted to know if Kennedy and Bell were still outside. Bailey nodded that they were and went outside to find Kennedy and Bell at the top of the stairs just outside the apartment, and Kennedy was wearing the black ski mask. Kennedy pushed Bailey into the apartment, and Armstrong went into a bedroom. Kennedy and Bell, with guns drawn, told everyone, including Bailey, to empty their pockets, which they did. Blair's keys were on the floor, and Kennedy gave the keys to Bell and told him to go start the van. Bell left, and Blair then wrestled with Kennedy over the gun and the gun went off. When Kennedy slipped, Blair ran out of the apartment, and Kennedy ran after him and shot at him. After waiting in the apartment a few minutes, Bailey ran to a friend's nearby apartment; he saw Blair on the ground as he ran away.

A friend drove Bailey to Ennis, where his mother picked him up. Bailey told his mother what had happened, and she called police and told them of his involvement. Bailey then met with police and gave them two statements. Bailey said that his role was only to be a lookout while Kennedy and Bell stole the cocaine bricks from Blair's van and that he did not know they were going to commit robbery. Bailey testified that Morris was wearing a grill that evening, but Morris was recalled as a witness and said that while he did have a grill, he was not wearing it that evening.

*Terrence Brown*: Brown lived next door to Welch in a downstairs apartment and said that he saw several men hanging out in the parking lot. He then saw Bailey at the top of the stairs and Welch at the bottom by his door. Welch asked to borrow a

screwdriver, and Brown loaned him one.  Brown went back into his apartment and soon heard a bunch of footsteps and commotion upstairs, including a man asking for money, dope, and keys to a van.  He next heard several shots come from the upstairs apartment and then a couple more shots outside of the apartment, along with more footsteps coming down the stairs.  He opened the door and found Blair on the floor with gunshot wounds.  A woman in Brown's apartment called 9-1-1.  After that evening, Brown found a gun clip on the ground in the area next to the apartments, and he called police and gave it to them.[1]

*Atavia Armstrong*:  Armstrong testified that she knew Kennedy and Bell, and the day before the incident they told her they were going to buy bullets at Wal-Mart and to shop for a clip.  Regarding the day in question, she testified similarly to Solomon and Bailey that Bailey was at her apartment with a gun and that he left soon after Blair and Solomon arrived.  They watched television and then went outside and talked while Blair smoked a cigar, after which they returned to the apartment and were talking.  Bailey called Armstrong to ask if Blair and Solomon were still there and indicated that he wanted to return to the apartment.  He told Armstrong not to let Blair leave and asked if Blair's van was unlocked, to which Armstrong said she did not know.  Bailey then said that he was on his way over with Bell.

A couple of minutes later, Bailey came into the apartment, and when Blair

---

[1] Two gun-shop employees identified Kennedy as being involved in the purchase of a 9mm clip three days before the crime.  The clip that Brown found was consistent with the one bought at the gun shop, and it was found along the route taken by Kennedy from the apartment to the college after the shooting.  Also, a college coach who knew Kennedy testified that, around the time of the shooting, there was a shooter-on-campus alert and that he saw Kennedy near the college's intramural fields at that time.

started to leave, Bailey got in front of him at the door. Two men wearing masks and carrying guns then came up the stairs and were behind Bailey. Armstrong said that one of the masked men was Bell because she recognized his voice and a tattoo near his eye, and she admitted that she told police that the other masked gunman was Kennedy. When she saw the guns, she ran to her bedroom. Bailey came into her bedroom, as did Kennedy to ask who was in there, and Armstrong recognized Kennedy's voice. After Kennedy left her room, she looked through her cracked-open bedroom door and saw Kennedy and Blair fighting with Kennedy holding a gun near Blair's head, and a shot went off in the air. Blair pushed Kennedy to the floor and ran toward the front door, and Armstrong then saw Kennedy shooting at Blair and heard a lot of gunshots. Bell had already left the apartment when the shooting began.

Armstrong then went outside to check on Bailey and found Blair wounded at the bottom of the stairs. She met with police several times and gave several written statements. She spoke with Kennedy after the incident and after she had first met with police, and she said that Kennedy told her that he had tried to shoot Blair in the head but he had run out of bullets. He also told her that he threw the gun in a lake or pond.

On cross, Armstrong admitted to giving inconsistent written statements to police and to Kennedy's attorney and investigators, to whom she admitted lying, but Armstrong claimed that her trial testimony was the truth.

### Accomplice-Witness Issues

The court's charge instructed the jury that Bailey was an accomplice and gave an accomplice-witness instruction for Bailey's testimony. A person who participated in the

same crime and who was later convicted of the offense under a plea agreement for his participation is an accomplice as a matter of law. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008).

In his first two issues, Kennedy asserts that the evidence is insufficient to support Kennedy's convictions because the accomplice-witness testimony was not corroborated and that the trial court erred in failing to instruct the jury that Morris and Armstrong were also accomplices (Kennedy did not request an accomplice-witness instruction for either Morris or Armstrong). Kennedy's third issue asserts that he received ineffective assistance of counsel because his trial counsel failed to request an accomplice-witness instruction for either Morris or Armstrong.

More specifically, Kennedy's first issue asserts that Morris and Armstrong were accomplices as a matter of law or as a matter of fact, that their testimony could not be used to corroborate Bailey's testimony, and that the testimony of all three accomplices was not corroborated.

> Texas law requires that, before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime. This accomplice witness rule creates a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards. An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state. To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed it. In addition, the witness's mere presence at the scene of the crime does not render that witness an accomplice witness. And complicity with an

accused in the commission of another offense apart from the charged offense does not make that witness's testimony that of an accomplice witness. In short, if the witness cannot be prosecuted for the offense with which the defendant is charged, or a lesser-included offense of that charge, the witness is not an accomplice witness as a matter of law.

A trial judge, therefore, has no duty to instruct the jury that a witness is an accomplice witness as a matter of law unless there exists no doubt that the witness is an accomplice. For instance, the instruction is appropriate when the witness is charged with the same offense as the defendant or a lesser-included offense or when the evidence clearly shows that the witness could have been so charged. If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, the trial judge should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." However, as with an accomplice as a matter of law, there must still be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required.

*Druery v. State*, 225 S.W.3d 491, 498-99 (Tex. Crim. App. 2007) (citations omitted).

Here, neither Morris nor Armstrong was an accomplice to *aggravated robbery* as a matter of law or as a matter of fact. *See id.* at 498 ("To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes *the commission of the offense with which the defendant is charged*.") (emphasis added). The evidence does not show that either Morris or Armstrong "performed any affirmative act in the commission of" aggravated robbery or a lesser-included offense of aggravated robbery. *See id.* at 499-500. At best, the evidence shows only that Armstrong was complicit and that Morris may have been complicit in the offense of burglary of a vehicle (Blair's van).[2]

---

[2] Kennedy does not assert that burglary of a vehicle is a lesser-included offense of aggravated robbery, and the State demonstrates that it is not.

Because Morris and Armstrong were not accomplices to aggravated robbery or to a lesser-included offense of aggravated robbery as a matter of law or as a matter of fact, their testimony could be used to corroborate Bailey's accomplice-witness testimony and was sufficient to do so. Moreover, Solomon's identification of Kennedy as one of the gunmen in the robbery corroborated Bailey's testimony. We overrule issue one. And because Morris and Armstrong were not accomplices, the trial court did not err in failing to so instruct the jury, and his trial counsel was not ineffective in failing to request an accomplice-witness instruction for them. Issues two and three are overruled.

### Cross-Examination

In his fourth issue, Kennedy asserts that the trial court erred in barring him from cross-examining Bailey and Armstrong about Bailey's alleged sexual relationship with Armstrong's minor cousin. Kennedy's basis for this line of cross-examination was to establish that Kennedy had either disclosed or threatened to disclose to the minor's father the relationship between Bailey and the minor, thus showing Bailey's bias against Kennedy and giving Bailey a motive to lie about Kennedy's involvement in the robbery. Kennedy further theorizes that, because Bailey and Armstrong were close friends (Bailey was "like a brother") at the time, Armstrong was loyal to Bailey and her testimony against Kennedy was in retaliation for Kennedy's actual or threatened disclosure of the relationship.

During Bailey's testimony, the trial court disallowed Kennedy from asking him about his relationship with the minor. Outside the presence of the jury, Kennedy attempted to make an offer of proof on this subject, and Bailey refused to answer

several questions about the relationship by asserting his Fifth Amendment right against self-incrimination. *See generally Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986) (stating that individual's constitutional privilege against self-incrimination overrides constitutional right to compulsory process); *Trenor v. State*, 333 S.W.3d 799, 805 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (same). In his brief, Kennedy appears to concede that Bailey's invocation of his Fifth Amendment right did not result in error: "While Bailey asserted his 5th amendment rights, Armstrong had no such right in the situation." And because Kennedy does not raise an issue about the propriety of Bailey's exercise of his Fifth Amendment right, we overrule issue four as to Kennedy's complaint about the trial court's refusal to allow Kennedy to question Bailey about the relationship.

Kennedy also argues that he should have been allowed to cross-examine Armstrong about Bailey's alleged sexual relationship with Armstrong's minor cousin and that the trial court abused its discretion in disallowing that cross-examination. Kennedy asserts on appeal a Confrontation Clause (Sixth Amendment) violation, but at trial, when Kennedy attempted to question Armstrong about the relationship, his only argument to the trial court was that Armstrong could be asked about it as a prior inconsistent statement that Armstrong had made to Kennedy's lawyer and investigator. Kennedy cannot raise his Confrontation Clause argument as to Armstrong for the first time on appeal. *See* TEX. R. APP. P. 33.1(a); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (objection on hearsay grounds failed to preserve error on Confrontation Clause grounds). We thus overrule issue four as to Kennedy's complaint

about the trial court's refusal to allow Kennedy to question Armstrong about the relationship.

Having overruled all of Kennedy's issues, we affirm the trial court's judgments.

REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed March 28, 2013
Do not publish
[CRPM]